## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| ANTONIO GABILONDO, derivatively on behalf of DAVITA INC., | |
| Plaintiff, | **C.A. No. _____** |
| v. | |
| KENT J. THIRY, JAMES K. HILGER, PAMELA M. ARWAY, CHARLES G. BERG, CAROL ANTHONY DAVIDSON, BARBARA J. DESOER, PAUL J. DIAZ, PETER T. GRAUER, JOHN M. NEHRA, WILLIAM L. ROPER, ROGER J. VALINE, and PHYLLIS R. YALE, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| DAVITA INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Antonio Gabilondo ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant DaVita Inc. ("DaVita" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Kent J. Thiry, James K. Hilger, Pamela M. Arway, Charles G. Berg, Carol Anthony Davidson, Barbara J. Desoer, Paul J. Diaz, Peter T. Grauer, John M. Nehra, William L. Roper, Roger J. Valine, and Phyllis R. Yale (collectively, the "Individual Defendants," and together with DaVita, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of DaVita, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(A) of

the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the

Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his

own acts, and information and belief as to all other matters, based upon, *inter alia*, the

investigation conducted by and through Plaintiff's attorneys, which included, among other

things, a review of the Defendants' public documents, conference calls and announcements made

by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and

press releases published by and regarding DaVita, legal filings, news reports, securities analysts'

reports and advisories about the Company, and information readily obtainable on the Internet.

Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein

after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing

committed by DaVita's directors and officers beginning in January, 2006 through the present

(the "Relevant Period").

2.      DaVita is a company that caters to patients suffering from end-stage renal disease

("ESRD") or chronic kidney failure by providing them with kidney dialysis services.  The

Company provides acute inpatient dialysis services in about 900 hospitals in the United States,

and related laboratory services.  DaVita also operates kidney dialysis centers and provides

related lab services in outpatient dialysis centers.

3.      During the Relevant Period, and in breach of their fiduciary duties, the Individual

Defendants caused the Company to engage in practices whereby it fraudulently sought to, *inter

alia*, take advantage of government funding for patients' medical expenses, which have subjected

the Company to: (1) an investigation by the United States Office of Inspector General ("OIG");

and (2) an investigation by the United States Attorney's Office for the Northern District of Texas ("Texas-USAO").

4.      During the Relevant Period, DaVita was also involved in an unlawful and fraudulent scheme to maximize the Company's profits by steering patients that had government-subsidized health insurance into private health insurance plans, which is the subject of an investigation by the United States Attorney's Office for the District of Massachusetts ("Mass-USAO").

5.      The underlying conduct giving rise to the three foregoing investigations is herein collectively referred to as the "Fraudulent Insurance Practices."

6.      The Individual Defendants additionally breached their fiduciary duties, from at least August 4, 2015, by making and/or causing the Company to make false and/or misleading statements and/or omissions of material fact.

7.      When DaVita provides one session of dialysis to patients suffering from ESRD, the Company will typically bill commercial insurers more than $4,000 for such services. However, for Medicaid and Medicare-eligible patients, Medicaid and Medicare will only pay the Company reimbursement rates of $300 or less for the same service.  Thus, the Company would increase their revenue if more of their patients had private, commercial insurance.  Notably, the Company's revenues derived from private insurance companies was in large part responsible for the Company's profits.

8.      In fact, despite that patients who had commercial health insurance only generated 34% of the Company's total dialysis services revenue in 2015, nearly all of DaVita's profits were derived from commercial payors.   In light of these significant incentives, the Individual Defendants caused the Company to utilize deceptive and unlawful means to systematically target

patients with government-subsidized health insurance and convince them to enroll in private, commercial insurance and reject or drop the affordable government insurance options available to them.

9.      As part of their scheme, the Company informed patients currently enrolled in Medicare and Medicaid that the American Kidney Fund ("AKF"), a third party charitable 501(c)(3) payor, would cover their monthly health insurance premiums, seeking to have the Medicare and Medicaid patients obtain private insurance and coverage that would typically be untenable for them financially.   This option was only available because DaVita and its Competitors illegally funneled money to the AKF, which then used the funds to reimburse the patients' health care premiums.   The AKF only funded insurance for dialysis for patients with ESRD, and did not fund insurance for alternative treatments.   Of note, DaVita would only benefit from the AKF funding insurance for dialysis, and not for alternative treatments for patients with ESRD.

10.     On July 1, 2016, UnitedHealthcare of Florida, Inc., UnitedHealthcare of Ohio, Inc., and All Savers Insurance Company (collectively, "UnitedHealth") sued American Renal Associates Holdings, Inc. and American Renal Associates LLC (collectively, "ARAH"), a kidney-care chain and one of DaVita's competitors, accusing it of fraud.   UnitedHealth alleged that ARAH violated insurance fraud statutes and various state anti-kickback statues by engaging in an illegal and fraudulent scheme whereby it convinced Medicare and Medicaid-eligible patients to enroll in UnitedHealth plans through the AKF.   The complaint filed by UnitedHealth specifically asserts that ARAH was incentivized by the out-of-network reimbursement rate for dialysis services provided by UnitedHealth, which was substantially greater than the rates paid by Medicare and Medicaid.

11.     Not long after, the Individual Defendants' scheme began to breakdown, as the investing public began to become aware that DaVita, also through its relationship with the AKF, was engaging in the same type of illegal conduct as ARAH.

12.     On August 18, 2016, The Centers for Medicare & Medicaid Services ("CMS"), sent letters to DaVita and all Medicare-enrolled dialysis centers as part of the issuance of a public request for information with regard to the alleged steering of Medicaid and Medicare beneficiaries into other plans in order to earn higher reimbursement rates.  The letters informed DaVita and each of the Medicare-enrolled dialysis centers of the CMS' announcement. Specifically, the CMS' request for letters and information concerned situations where Medicare and/or Medicaid patients were steered into Affordable Care Act-compliant plans which could have resulted in the disruption of care associated with a change in network providers.

13.     Beyond its request, the CMS stated that it was determining whether to impose financial penalties on dialysis providers that were found to have steered individuals eligible for Medicare into Affordable Care Act ("ACA") plans and also indicated that it was determining whether to ban or limit premium payments for ACA plans by health care providers.  The CMS also indicated that it was considering changes to Medicare and Medicaid's provider enrollment rules.

14.     On August 18, 2016, the price per share of DaVita stock at closing was $67.65. On August 19, 2016, in response to CMS's public request, the price per share of DaVita stock at closing fell to $64.48.

15.     On October 23, 2016, the *St. Louis Post-Dispatch* published an article accusing the Company of directly steering clients to private insurers and paying for health insurance premiums through the AKF with the Company's own money.  The article cited internal

Company emails that revealed that the Company was engaging in a campaign that targeted patients to get them to purchase insurance that they did not necessarily need by telling them that their monthly premiums would be paid for by a nonprofit foundation—the AKF.  The article additionally described DaVita's campaign as "coordinated" and stated that the Company "had a financial incentive to get certain Medicaid-eligible dialysis patients to enroll in private insurance."

16.     On October 21, 2016, the last day the market was open prior to the publishing of the *St. Louis Post-Dispatch* article, the price per share of DaVita stock at closing was $60.96. On October 24, 2016, the first day the market was open after the publishing of the *St. Louis Post-Dispatch* article, in response to the news, the price per share of DaVita stock at closing fell to $58.10.

17.     On October 31, 2016, the Company issued a press release where it announced that it was, effective immediately, suspending support for applications to the AKF for charitable premium assistance by patients enrolled in minimum essential Medicaid coverage.   The Company estimated that a policy change that prevented patients with minimum essential Medicaid coverage from accessing charitable premium assistance "would result in a reduction in its annualized operating income of up to approximately $140 million before any offsets."

18.     On January 6, 2017, *The Wall Street Journal* published an article that noted that U.S. Department of Justice (the "DOJ") investigators were "probing a controversial arrangement under which kidney-care companies support charitable efforts to help patients pay health-insurance premiums, according to disclosures from major dialysis providers."   The article additionally noted that the Boston U.S. Attorney's Office had subpoenaed the Company and the AKF, "seeking 'the production of information related to charitable premium assistance.'"

19.     From at least August 4, 2015, and in breach of their fiduciary duties owed to DaVita, the Individual Defendants caused the Company to: (1) fail to disclose the true nature of its relationship with the AKF; (2) include fraudulently derived revenue from this scheme in its financial reports; and (3) make, or themselves made, false and/or misleading statements and/or omissions of material fact regarding the above fraudulent scheme (collectively, the "AKF Fraud").  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

20.     Moreover, the Individual Defendants failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.  While the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact, a majority of the Individual Defendants engaged in lucrative insider sales.

21.     While enjoying the benefits themselves, the Individual Defendants caused the Company to incur a substantial loss by making the Company repurchase over one hundred million dollars' worth of the Company's common stock at artificially inflated prices.  Based on the Company's common stock price on October 24, 2016, the first day the market was open following the Individual Defendants' scheme being exposed, the Company had paid over $165.4 million more than the stock was worth.

22.     In light of the Individual Defendants' misconduct, which has subjected DaVita to an investigation by the OIG, the Texas-USAO, and the Mass-USAO, and the Company, its Chief Executive Officer ("CEO"), and its Chief Accounting Officer ("CAO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District

7

Court for the District of Colorado (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, including through insider transactions, the Company will have to expend many millions of dollars.

23.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's and the CAO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationship with each other, and their not being disinterested and/or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the federal securities class action based on violations of the Exchange Act.

25.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

26.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

27.     Venue is proper in this district because DaVita is incorporated in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

28.     Plaintiff is a current shareholder of DaVita.   Plaintiff has continuously held DaVita common stock at all relevant times.

### Nominal Defendant DaVita

29.     DaVita is a Delaware corporation with its principal executive offices at 2000 16th Street, Denver, Colorado 80202.   DaVita's shares trade on the NYSE under the ticker symbol "DVA."   Prior to September 1, 2016, the Company was named DaVita HealthCare Partners Inc.

### Defendant Thiry

30.     Defendant Kent J. Thiry ("Thiry") has served as the Company's CEO since October 1999 and as Chairman of the Board since June 2015.   According to the Company's Schedule 14A filed with the SEC on May 10, 2016 (the "2016 Proxy Statement"), as of March 31, 2016, Defendant Thiry beneficially owned about 2,053,122 shares of the Company's common stock.   Given that the price per share of the Company's common stock at the close of trading on March 31, 2016 was $73.38, Thiry owned about $150.6 million worth of DaVita stock.

31.     For the fiscal year ended December 31, 2016, Defendant Thiry received $12,296,671 in compensation from the Company.   This included $1,273,077 million in salary,

$4,531,740 in stock awards, $4,082,358 in option awards, $1,705,153 in non-equity incentive plan compensation, and $704,343 in all other compensation.

32.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Thiry made the following dispositions of Company stock.  On November 9, 2015, Defendant Thiry disposed of 300,000 shares of Company stock for $75.61 per share.  On May 20, 2016, Defendant Thiry disposed of 32,880 shares of Company stock for $77.00 per share.  Thus, in total, before the AKF Fraud was exposed, Defendant Thiry disposed of 328,880 Company shares on inside information, from which he benefited in the amount of approximately $25.2 million.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

33.     The Company's Schedule 14A filed with the SEC on May 1, 2017 (the "2017 Proxy Statement") stated the following about Defendant Thiry:

**Kent J. Thiry**,[1] 61, has been our chairman of the Board since June 2015 and from October 1999 until November 2012, and our chief executive officer since October 1999. In October 2014, Mr. Thiry also became chief executive officer of DMG. From November 2012 until June 2015, Mr. Thiry served as our co-chairman of the Board. From June 1997 until he joined us in October 1999, Mr. Thiry was chairman of the board and chief executive officer of Vivra Holdings, Inc., which was formed to operate the non-dialysis business of Vivra Incorporated ("Vivra") after Gambro AB acquired the dialysis services business of Vivra in June 1997. From September 1992 to June 1997, Mr. Thiry was the president and chief executive officer of Vivra, a provider of renal dialysis services and other healthcare services. From April 1992 to August 1992, Mr. Thiry was president and co-chief executive officer of Vivra, and from September 1991 to March 1992, he was president and chief operating officer of Vivra. From 1983 to 1991, Mr. Thiry was associated with Bain & Company, first as a consultant, and then as vice president. Mr. Thiry previously served on the board of Varian Medical Systems, Inc. from August 2005 to February 2009 and served as the non-executive chairman of Oxford Health Plans, Inc. until it was sold to UnitedHealth

---

[1] Emphasis in original unless otherwise stated.

Group in July 2004. As a member of management, Mr. Thiry provides significant healthcare industry experience and unique expertise regarding the Company's business and operations as well as executive leadership and management experience.

**Defendant Hilger**

34. Defendant James K. Hilger ("Hilger") has served as the Company's CAO since April 2010 and served as the Company's Interim Chief Financial Officer from March 2015 until February 2017. According to the Company's 2016 Proxy Statement, as of March 31, 2016, Defendant Hilger beneficially owned about 67,166 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2016 was $73.38, Hilger owned about $4.9 million worth of DaVita stock.

35. For the fiscal year ended December 31, 2016, Defendant Hilger received $1,094,996 in compensation from the Company. This included $375,000 in base salary, a $210,000 bonus, $124,745 in stock awards, $92,786 in option awards, $292,105 in non-equity incentive plan compensation, and $360 in all other compensation.

36. During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Hilger made the following dispositions of Company stock. On May 16, 2016, Defendant Hilger disposed of 3,983 shares of Company stock for $75.59 per share. On May 23, 2016, Defendant Hilger disposed of 3,416 shares of Company stock for $76.79 per share. Thus, in total, before the AKF Fraud was exposed, Defendant Hilger disposed of 7,399 Company shares on inside information, from which he benefited in the amount of approximately $563,388. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

37.     The Company's 2017 Proxy Statement stated the following about Defendant Hilger:

> *James K. Hilger* became our chief accounting officer in April 2010. Mr. Hilger also served as our interim chief financial officer from March 2015 until February 2017 and from April 2012 until November 2013. Prior to April 2010, Mr. Hilger served as our vice president and controller since May 2006, after having served as our vice president, finance beginning in September 2005. Mr. Hilger was our acting chief financial officer from November 2007 through February 2008. From September 2003 to September 2005, Mr. Hilger served as vice president, finance and administration and chief financial officer of Pyramid Breweries, a brewer of specialty beverages. From December 1998 to July 2003, Mr. Hilger served as chief executive officer and chief financial officer of WorldCatch, Inc., a seafood industry company. From 1987 until joining WorldCatch, Inc., Mr. Hilger held a variety of senior financial positions in the food industry. Mr. Hilger began his career in public accounting with Ernst & Whinney.

**Defendant Arway**

38.     Defendant Pamela M. Arway ("Arway") has served as a Company director since May 2009.  Defendant Arway also serves as Chair of the Compensation Committee and as a member of the Audit Committee and as a member of the Nominating and Governance Committee.   According to the Company's 2016 Proxy Statement, as of March 31, 2016, Defendant Arway beneficially owned about 89,808 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2016 was $73.38, Arway owned about $6.5 million worth of DaVita stock.

39.     For the fiscal year ended December 31, 2016, Defendant Arway received $307,959 in compensation from the Company.  This included $155,000 in fees earned, $94,985 in stock awards, and $57,974 in stock-settled stock appreciation right ("SSAR") awards.

40.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Arway made the following dispositions of Company stock.  On February 29, 2016, Defendant Arway disposed of 9,026 shares of Company stock for $66.00 per share.  On May 25, 2016, Defendant Arway

disposed of 10,824 shares of Company stock for $77.16 per share.  Thus, in total, before the AKF Fraud was exposed, Defendant Arway disposed of 19,850 Company shares on inside information, from which he benefited in the amount of approximately $1.4 million.  Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

41.     The Company's 2017 Proxy Statement stated the following about Defendant Arway:

> **Pamela M. Arway**, 63, has been one of our directors since May 2009. From 2005 to 2007, Ms. Arway served as the president of American Express International, Japan, Asia-Pacific, Australia region, a global payment services and travel company. Ms. Arway joined the American Express Company in 1987 after which she served in various capacities, including as chief executive officer of American Express Australia Limited from 2004 to 2005 and as executive vice president of Corporate Travel, North America from 2000 to 2004. Prior to her retirement in October 2008, she also served as advisor to the American Express Company's chairman and chief executive officer. Ms. Arway has also been a member of the board of the Hershey Company, a chocolate and confectionary company, since May 2010. She serves as a member of the Audit and Finance Committees of Hershey Company's board. She joined the board of Iron Mountain Incorporated, an enterprise information management services company, in March 2014 and serves as chair of its Compensation Committee. Ms. Arway brings significant leadership experience as a global executive, with extensive management experience in the areas of marketing, international business, finance and government affairs.

**Defendant Berg**

42.     Defendant Charles G. Berg ("Berg") has served as a Company director since March 2007.  Defendant Berg also serves as executive chairman of the Company's integrated healthcare business, DaVita Medical Group.  According to the Company's 2016 Proxy Statement, as of March 31, 2016, Defendant Berg beneficially owned about 77,437 shares of the Company's common stock.  Given that the price per share of the Company's common stock at

the close of trading on March 31, 2016 was $73.38, Berg owned about $5.6 million worth of DaVita stock.

43.     For the fiscal year ended December 31, 2016, Defendant Berg received $386,931 in compensation from the Company.  This included $249,701 in fees earned, $79,256 in stock awards, and $57,974 in SSAR awards.

44.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Berg made the following disposition of Company stock.  On August 6, 2015, Defendant Berg disposed of 11,636 shares of Company stock for $81.01.  Thus, in total, before the AKF Fraud was exposed, Defendant Berg disposed of 11,636 Company shares on inside information, from which he benefited in the amount of approximately $942,632.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

45.     The Company's 2017 Proxy Statement stated the following about Defendant Berg:

**Charles G. Berg**, 59, has been one of our directors since March 2007, and currently serves as executive chairman of our integrated healthcare business, DaVita Medical Group ("DMG", formerly known as HealthCare Partners or HCP). Mr. Berg served as executive chairman and as a member of the board of directors of WellCare Health Plans, Inc. ("WellCare"), a provider of managed care services for government-sponsored healthcare programs from January 2008 to December 2010. Mr. Berg served as non-executive chairman of the board of directors of WellCare from January 2011 until his retirement in May 2013. From January 2007 to April 2009, Mr. Berg was a senior advisor to Welsh, Carson, Anderson & Stowe, a private equity firm. From April 1998 to July 2004, Mr. Berg held various executive positions with Oxford Health Plans, Inc. ("Oxford"), a health benefit plan provider, which included chief executive officer from November 2002 to July 2004 when Oxford was acquired by UnitedHealth Group, president and chief operating officer from March 2001 to November 2002 and executive vice president, medical delivery from April 1998 to March 2001. From July 2004 to September 2006, Mr. Berg served as an executive of UnitedHealth Group and was primarily responsible for integrating the Oxford business. Mr. Berg currently serves on the Operating Council of Consonance Capital Partners, a

14

private equity firm, and the board of directors of Justworks, Inc., a private human resources and payment company. Mr. Berg is an experienced business leader with significant experience in the healthcare industry and brings an understanding of the operational, financial and regulatory aspects of our industry and business.

### **Defendant Davidson**

46.     Defendant Carol Anthony Davidson ("Davidson") has served as a Company director since December 2010. Defendant Davidson also serves as Chair of the Audit Committee and as a member of the Nominating and Governance Committee and as a member of the Clinical Performance Committee. According to the Company's 2016 Proxy Statement, as of March 31, 2016, Defendant Davidson beneficially owned about 49,697 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2016 was $73.38, Davidson owned about $3.6 million worth of DaVita stock.

47.     For the fiscal year ended December 31, 2016, Defendant Davidson received $317,959 in compensation from the Company. This included $165,000 in fees earned, $94,985 in stock awards, and $57,974 in SSAR awards.

48.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Davidson made the following disposition of Company stock. On August 17, 2016, Defendant Davidson disposed of 4,038 shares of Company stock for $79.93 per share. Thus, in total, before the AKF Fraud was exposed, Defendant Davidson disposed of 4,038 Company shares on inside information, from which he benefited in the amount of approximately $322,757. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

49.     The Company's 2017 Proxy Statement stated the following about Defendant Davidson:

**Carol Anthony ("John") Davidson**, 61, has been one of our directors since December 2010. From January 2004 until his retirement in September 2012, Mr. Davidson served as the senior vice president, controller and chief accounting officer of Tyco International Ltd. ("Tyco"), a provider of diversified industrial products and services. Prior to joining Tyco in January 2004, he spent six years at Dell Inc., a computer and technology services company, where he held various leadership roles, including vice president, audit, risk and compliance, and vice president, corporate controller. In addition, he previously spent 16 years at Eastman Kodak Company, a provider of imaging technology products and services, in a variety of accounting and financial leadership roles. Mr. Davidson is a director of Pentair Plc., a provider of products and solutions in water, fluids, thermal management and equipment protection, Legg Mason Inc., a global asset management firm, and TE Connectivity Ltd., a technology company that was spun off by Tyco. From 2010 to 2015, Mr. Davidson was a member of the Board of Trustees of the Financial Accounting Foundation which oversees financial accounting and reporting standards setting processes for the United States. Mr. Davidson also serves on the Board of Governors of the Financial Industry Regulatory Authority. Mr. Davidson is a CPA with more than 30 years of leadership experience across multiple industries and brings a strong track record of building and leading global teams and implementing governance and controls processes.

**Defendant Desoer**

50.     Defendant Barbara J. Desoer ("Desoer") has served as a Company director since October 2015.  Defendant Desoer is also Chair of the Compliance Committee and a member of the Clinical Performance Committee.  According to the Company's 2016 Proxy Statement, as of March 31, 2016, Defendant Desoer beneficially owned about 642 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 31, 2016 was $73.38, Desoer owned about $47,109 worth of DaVita stock.

51.     For the fiscal year ended December 31, 2016, Defendant Desoer received $210,796 in compensation from the Company.  This included $103,288 in fees earned, $23,775 in stock awards, and $83,733 in SSAR awards.

52.     The Company's 2017 Proxy Statement stated the following about Defendant Desoer:

**Barbara J. Desoer**, 64, has been one of our directors since October 2015. Ms. Desoer currently serves as the chief executive officer and a member of the board of directors of Citibank, N.A., a wholly owned subsidiary of Citigroup Inc. and a diversified global financial services company, since April 2014. Ms. Desoer previously served as the chief operating officer of Citibank, N.A. from October 2013 to April 2014. In addition to her chief executive officer responsibilities, Ms. Desoer leads Citigroup's comprehensive capital analysis and review process. Prior to Citibank, Ms. Desoer spent 35 years at Bank of America, a diversified global financial services company, most recently as president, Bank of America Home Loans, where she led the integration of Countrywide, the largest mortgage originator and servicer in the United States. In previous Bank of America roles, Ms. Desoer was a Global Technology & Operations executive, an international market-focused position leading teams in the United Kingdom, Asia and Latin America. She also served as president, Consumer Products. She serves on the board of visitors at the University of California at Berkeley. Ms. Desoer also has served on the board of directors of various non-profit and privately held corporations. Ms. Desoer is an experienced business leader with extensive management experience, and brings a deep understanding of regulated businesses.

### Defendant Diaz

53.     Defendant Paul J. Diaz ("Diaz") has served as a Company director since July 2007.  Defendant Diaz is also a member of the Public Policy Committee.  According to the Company's 2016 Proxy Statement, as of March 31, 2016, Defendant Diaz beneficially owned about 13,094 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 31, 2016 was $73.38, Diaz owned about $960,837 worth of DaVita stock.

54.     For the fiscal year ended December 31, 2016, Defendant Diaz received $282,959 in compensation from the Company.  This included $130,000 in fees earned, $94,985 in stock awards, and $57,974 in SSAR awards.

55.     The Company's 2017 Proxy Statement stated the following about Defendant Diaz:

**Paul J. Diaz**, 55, has been one of our directors since July 2007. Mr. Diaz currently serves as a partner of Cressey & Company, a private investment firm focused exclusively on investing in and building healthcare businesses. Since August 2014, Mr. Diaz has served as a partner at Guidon Partners LP, an

investment strategy partnership. He served as executive vice chairman of Kindred Healthcare, Inc. ("Kindred"), a provider of long-term healthcare services in the United States, from March 2015 until March 2016, chief executive officer from January 2004 to March 2015, as well as president from January 2002 to May 2012 and as chief operating officer from January 2002 to December 2003. Prior to joining Kindred, Mr. Diaz was the managing member of Falcon Capital Partners, LLC, a private investment and consulting firm, and from 1996 to July 1998, Mr. Diaz served in various executive capacities with Mariner Health Group, Inc., a healthcare facility operator, including as executive vice president and chief operating officer. Mr. Diaz serves on the boards of Kindred and Patterson Medical Holdings, Inc., a private medical supply distribution company, and the board of visitors of Georgetown University Law Center and previously served on the board of PharMerica Corporation. Mr. Diaz is an experienced business leader with significant experience in the healthcare industry and brings an understanding of the operational, financial and regulatory aspects of our industry and business.

### **Defendant Grauer**

56.     Defendant Peter T. Grauer ("Grauer") has served as a Company director since August 1994 and as the Company's lead independent director since 2003.  Defendant Grauer also serves as Chair of the Nominating and Governance Committee and as a member of the Compensation Committee.  According to the Company's 2016 Proxy Statement, as of March 31, 2016, Defendant Grauer beneficially owned about 154,921 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 31, 2016 was $73.38, Grauer owned about $11.3 million worth of DaVita stock.

57.     For the fiscal year ended December 31, 2016, Defendant Grauer received $355,959 in compensation from the Company.  This included $132,500 in fees earned, $138,781 in stock awards, and $84,678 in SSAR awards.

58.     The Company's 2017 Proxy Statement stated the following about Defendant Grauer:

**Peter T. Grauer**, 71, has been one of our directors since August 1994 and our lead independent director since 2003. Mr. Grauer has been chairman of the board of Bloomberg, Inc., a business and financial information company, since April 2001, treasurer since March 2001 and was its chief executive officer from March

2002 until July 2011. Mr. Grauer has also served as a non-executive director of Glencore plc, a global mining and commodities firm listed on the London Stock Exchange, since June 2013. From November 2000 until March 2002, Mr. Grauer was a managing director of Credit Suisse First Boston, a financial services firm. From September 1992 until November 2000, upon the merger of Donaldson, Lufkin & Jenrette ("DLJ"), a financial services firm, into Credit Suisse First Boston, Mr. Grauer was a managing director and founding partner of DLJ Merchant Banking Partners. Mr. Grauer serves as a director of Blackstone Group, L.P., a publicly traded global investment and advisory firm. Mr. Grauer has significant experience as a business leader and brings a deep understanding of our business and industry through his over 20 years of service as a member of the Board.

**Defendant Nehra**

59.     Defendant John M. Nehra ("Nehra") has served as a Company director since November 2000.  Defendant Nehra also serves as Chair of the Public Policy Committee. According to the Company's 2016 Proxy Statement, as of March 31, 2016, Defendant Nehra beneficially owned about 186,117 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 31, 2016 was $73.38, Nehra owned about $13.6 million worth of DaVita stock.

60.     For the fiscal year ended December 31, 2016, Defendant Nehra received $290,459 in compensation from the Company.  This included $137,500 in fees earned, $94,985 in stock awards, and $57,974 in SSAR awards.

61.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Nehra made the following disposition of Company stock.  On May 6, 2016, Defendant Nehra disposed of 16,314 shares of Company stock for $75.56 per share.  Thus, in total, before the AKF Fraud was exposed, Defendant Nehra disposed of 16,314 Company shares on inside information, from which he benefited in the amount of approximately $1.2 million.  His insider sales made with

knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

62. The Company's 2017 Proxy Statement stated the following about Defendant Nehra:

> **John M. Nehra**, 68, has been one of our directors since November 2000. From 1989 until his retirement in August 2016, Mr. Nehra was affiliated with New Enterprise Associates ("NEA"), a venture capital firm, including, from 1993 until his retirement, as general partner of several of its affiliated venture capital limited partnerships. Mr. Nehra also served as managing general partner of Catalyst Ventures, a venture capital firm, from 1989 to 2013. Mr. Nehra served on the boards of a number of NEA's portfolio companies until his retirement in August 2016 and remains a retired special partner of NEA. Mr. Nehra is an experienced business leader with approximately 44 years of experience in investment banking, research and capital markets and he brings a deep understanding of our business and industry through his nearly 17 years of service as a member of the Board as well as significant experience in the healthcare industry through his involvement with NEA's healthcare-related portfolio companies.

**Defendant Roper**

63.     Defendant William L. Roper ("Roper") has served as a Company director since May 2001.  Defendant Roper also serves as Chair of the Clinical Performance Committee and as a member of the Compliance Committee.  According to the Company's 2016 Proxy Statement, as of March 31, 2016, Defendant Roper beneficially owned about 85,306 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 31, 2016 was $73.38, Roper owned about $6.2 million worth of DaVita stock.

64.     For the fiscal year ended December 31, 2016, Defendant Roper received $280,459 in compensation from the Company.  This included $127,500 in fees earned, $94,985 in stock awards, and $57,974 in SSAR awards.

65.     The Company's 2017 Proxy Statement stated the following about Defendant Roper:

> **Dr. William L. Roper**, 68, has been one of our directors since May 2001. Dr. Roper has been chief executive officer of the University of North Carolina

("UNC") Health Care System, dean of the UNC School of Medicine and vice chancellor for medical affairs of UNC since March 2004. Dr. Roper also continues to serve as a professor of health policy and administration in the UNC School of Public Health and a professor of pediatrics and of social medicine in the UNC School of Medicine. From 1997 until March 2004, he was dean of the UNC School of Public Health. Before joining UNC in 1997, Dr. Roper served as senior vice president of Prudential Health Care. He also served as director of the Centers for Disease Control and Prevention from 1990 to 1993, on the senior White House staff in 1989 and 1990 and as the administrator of Centers for Medicare & Medicaid Services from 1986 to 1989. Dr. Roper was a member of and is the immediate past chairman of the board of the National Quality Forum, a non-profit organization that aims to improve the quality of healthcare. From December 2007 to November 2011, Dr. Roper served on the board of Medco Health Solutions, Inc., a pharmacy benefits management company, and since November 2011 has served on the board of its successor company, Express Scripts Holding Company. Dr. Roper brings substantial expertise in the medical field, an in-depth understanding of the regulatory aspects of our business as well as clinical, financial and operational experience.

**Defendant Valine**

66.     Defendant Roger J. Valine ("Valine") has served as a Company director since June 2006. Defendant Valine also serves as a member of the Audit Committee, as a member of the Compensation Committee, and as a member of the Nominating and Governance Committee. According to the Company's 2016 Proxy Statement, as of March 31, 2016, Defendant Valine beneficially owned about 101,842 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2016 was $73.38, Valine owned about $7.4 million worth of DaVita stock.

67.     For the fiscal year ended December 31, 2016, Defendant Valine received $285,459 in compensation from the Company. This included $132,500 in fees earned, $94,985 in stock awards, and $57,974 in SSAR awards.

68.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Valine made the following disposition of Company stock. On May 12, 2016, Defendant Valine disposed of 8,220

shares of Company stock for $76.34 per share.  Thus, in total, before the AKF Fraud was
exposed, Defendant Valine disposed of 8,220 Company shares on inside information, from
which he benefited in the amount of approximately $627,514.  His insider sales made with
knowledge of material non-public information before the material misstatements and omissions
were exposed demonstrate his motive in facilitating and participating in the scheme.

69.     The Company's 2016 Proxy Statement stated the following about Defendant
Valine:

> **Roger J. Valine**, 67, has been one of our directors since June 2006. From January
> 1992 to his retirement in June 2006, Mr. Valine served as both the president and
> chief executive officer of Vision Service Plan ("VSP"), the nation's largest
> provider of eyecare wellness benefits. Upon his retirement, Mr. Valine had
> worked for VSP for 33 years and provided consulting services to VSP through
> December 2008. Mr. Valine previously served on the boards of American
> Specialty Health Incorporated and SureWest Communications. Mr. Valine is an
> experienced business leader with significant experience in the healthcare industry
> and brings an understanding of the operational, financial and regulatory aspects of
> our business as well as extensive management experience.

### Defendant Yale

70.     Defendant Phyllis R. Yale ("Yale") has served as a Company director since July
2016.  Defendant Yale also serves as a member of the Compliance Committee and as a member
of the Public Policy Committee.

71.     For the fiscal year ended December 31, 2016, Defendant Yale received $143,645
in compensation from the Company.  This included $40,326 in fees earned, $44,896 in stock
awards, and $58,423 in SSAR awards.

72.     The Company's 2017 Proxy Statement stated the following about Defendant
Yale:

> **Phyllis R. Yale**, 59, has been one of our directors since July 2016. Ms. Yale has
> been an Advisory Partner with Bain & Company, Inc. ("Bain"), a global
> management consulting firm, since July 2010. Ms. Yale was a partner with Bain
> from 1987 to July 2010, and was a leader in building Bain's healthcare practice.

In her role at Bain, Ms. Yale works with healthcare payors, providers, and medical device companies, and frequently advises the world's leading private equity firms on their investments in the healthcare sector. She has served as a member of the board of directors of several public and private companies in the healthcare sector, and currently serves as Chair of the board of directors of Kindred Healthcare, Inc., a provider of long-term healthcare services in the United States. She is also Chair of the board of directors of Blue Cross Blue Shield of Massachusetts, a not-for-profit health plan headquartered in Boston, and a director of National Surgical Hospitals, a privately held specialty hospital operator. Ms. Yale previously served as a director of ValueOptions, Inc., a health improvement company specializing in mental and emotional wellbeing and recovery, which merged with Beacon Health Strategies during 2014. Ms. Yale has a deep knowledge base and experience in several segments of the healthcare industry including corporate strategies, marketing and cost and quality management, as well as mergers and acquisitions.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

73.    By reason of their positions as officers, directors, and/or fiduciaries of DaVita and because of their ability to control the business and corporate affairs of DaVita, the Individual Defendants owed DaVita and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage DaVita in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of DaVita and its shareholders so as to benefit all shareholders equally.

74.    Each director and officer of the Company owes to DaVita and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

75.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of DaVita, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

76.     To discharge their duties, the officers and directors of DaVita were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

77.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of DaVita, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised DaVita's Board at all relevant times.

78.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.  Additionally,

the Individual Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

79.     To discharge their duties, the officers and directors of DaVita were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of DaVita were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to DaVita's own Corporate Code of Ethics and its Corporate Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how DaVita conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of DaVita and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that DaVita's operations would comply with all

applicable laws and DaVita's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

      (f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

      (g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

      (h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

80.    Each of the Individual Defendants further owed to DaVita and the shareholders the duty of loyalty requiring that each favor DaVita's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

81.    At all times relevant hereto, the Individual Defendants were the agents of each other and of DaVita and were at all times acting within the course and scope of such agency.

82.    Because of their advisory, executive, managerial, and directorial positions with DaVita, each of the Individual Defendants had access to adverse, non-public information about the Company.

83.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by DaVita.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

84.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

85.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, insider transactions, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price while the Company repurchased its own stock and a majority of the Individual Defendants made illegal lucrative sales of Company stock based on material non-public information.

86.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of DaVita was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

87.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

88.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of DaVita, and was at all times acting within the course and scope of such agency.

## **DAVITA'S CODE OF ETHICS & CODE OF CONDUCT**

89.     Pursuant to the Company's Corporate Governance Code of Ethics (the "Code of Ethics"), the Company's employees "personally agree to advocate and adhere to the . . . Code of Ethics . . . ."

90.     The Company's one-page Code of Ethics requires employees to, among other things:

> Comply with all applicable governmental laws, rules and regulations, including full, fair, accurate, timely, and understandable disclosure in reports and documents the Company files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company.
>
> \* \* \*
>
> Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing one's independent judgment to be subordinated.
>
> \* \* \*
>
> Achieve responsible use of and control over all assets and resources employed or entrusted.

91.     Pursuant to the Company's Corporate Code of Conduct (the "Code of Conduct"), the Company employees' "[f]ull compliance with [the Code of Conduct] is essential."

92.     The Code of Conduct provides, as to "Our Responsibilities," that:

Compliance is everyone's responsibility:

- DaVita is committed to full compliance with federal healthcare program requirements.
- Read, understand and follow the Code and the Compliance Program.
- Seek guidance when in doubt.
- Avoid illegal, unethical or otherwise improper acts.
- Report any suspected violation of DaVita policies and procedures, laws or regulations applicable to DaVita's business or this Code.
- Assist authorized teammates with compliance inquiries, audits, investigations and other activities.
- Take responsibility and accountability for your actions.
- Notify Team Quest immediately if the government sanctions or excludes you from participation in any government funded program.

93.     The Code of Conduct provides, as to "Obligation to Report," that:

It is your duty to maintain the highest level of integrity and accountability by alerting a supervisor, senior management, Team Quest, JLD or the Compliance Hotline of suspected or actual violation of DaVita's policies and procedures, applicable laws and regulations, or this Code. We cannot exempt ourselves from the consequences of our own misconduct by reporting an issue, but self-reporting may be taken into account when determining appropriate corrective action. If you fail to report a violation of DaVita policies and procedures, applicable laws or regulations, or this Code, you may be subject to corrective action, up to and including termination of employment, to the extent permitted by law. Remaining silent about a violation of DaVita policies and procedures, applicable laws or regulations, or this Code puts you and DaVita in jeopardy.

94.     The Code of Conduct provides, as to "Responding to External Investigations," that, "We are committed to appropriately responding to, and not interfering with, any lawful government inquiry, audit or investigation.   We will be forthright in our dealings with government officials or employees who are responsible for administering and enforcing the law."

95.     The Code of Conduct provides, as to "Quality Patient Care," that: "We make a difference in each patient's life by providing quality care.   We treat all patients with warmth,

respect and dignity, providing care that is both medically necessary and appropriate.  We involve

patients in treatment planning and decisions affecting their care whenever appropriate."

96.     The Code of Conduct provides, as to "Business Relationships," that:

We always treat our business partners, vendors, and third parties with integrity. Business is conducted in a fair manner consistent with DaVita policies and procedures, applicable laws and regulations, and this Code.

We select business partners, vendors and third parties based on objective criteria including quality, price and service. We make partnering decisions based on the supplier's ability to meet our needs. Based on local laws and proposed business activities, DaVita may screen or conduct appropriate due diligence on its business partners, vendors and third parties, including to determine if they have been sanctioned by any government entity or are excluded from participation in government programs.

97.     The Code of Conduct provides, as to "Proper Coding, Billing and Patient

Accounting," that:

DaVita documents patient care completely and in a timely manner. The medical record is written evidence of the quality care we deliver to our patients. We educate our teammates and work diligently to prevent knowingly creating records that contain any false or misleading information.

We submit claims for payment or approval that are accurate, truthful, and contain properly documented codes. We only bill for goods or services that we provide. DaVita has implemented a process designed to identify mistakes in claims or reimbursements and timely make refunds where applicable.

98.     The Code of Conduct provides, as to "Accurate Financial Records," that:

We create and maintain accurate financial records. We never falsify or improperly alter information in any records, reports or other documents. All financial information must reflect actual transactions and conform to industry standards. These records serve as a basis for managing our business and are important in meeting our obligations to patients, teammates, business partners, vendors and third parties. We maintain a system of internal controls to provide reasonable assurances that all transactions are executed and recorded in a proper manner.

99.     The Code of Conduct provides, as to "Insider Trading," that:

We never use, for our personal gain, information about DaVita that is not available to the public. There may be times, in the course of our day-to-day work, when we learn of information about DaVita or a publicly traded business partner, vendor, or other third party of ours that is not yet available to the general public.

The use of such non-public or "insider" information for purposes of securities trading is strictly prohibited under DaVita policy and procedures, and securities laws.

100.    The Code of Conduct provides, as to "Anti-Corruption and Anti-Bribery Laws," that:

When we conduct business internationally, we comply with the U.S. Foreign Corrupt Practices Act (FCPA), as well as other anti-corruption and anti-bribery laws. We have a zero tolerance for violations of these laws. The FCPA consists of two basic principles:

(1) Prohibition of bribes to non-U.S. government officials and employees; and

(2) Maintenance of accurate books, records and accounting systems and proper internal accounting controls.

In addition, in certain jurisdictions, local laws prohibit bribing individuals associated with nongovernment entities in exchange for business favors or other advantages. This is known as "private" or "commercial" bribery.

We will not directly or indirectly give, offer, or promise anything of value to any government official or employee, referral source, or other person or entity whether affiliated with a government or private entity, with the corrupt intent to obtain or retain business, or secure an unfair business advantage. Nor will we use third parties to perform activities that would be in violations of DaVita's policies and procedures, applicable laws and regulations, or this Code.

Our business partners, vendors and third parties are also prohibited from giving, offering, or promising anything of value to any individual in violation of the FCPA or other anti-corruption and anti-bribery laws. All payments made on behalf of DaVita must include accurate, truthful and complete written documentation regarding the payment and the purpose of the payment.

Conversely, we will not solicit or accept anything of value from any person or entity seeking, entering into, or conducting a business transaction with DaVita that may compromise or appear to compromise our business decisions.

101.    The Code of Conduct provides, as to "Anti-Kickback Laws," that:

We conduct business dealings with referral sources (e.g., physicians and other healthcare providers) in accordance with local laws and regulations. In the U.S., this means business dealings with referral sources are at fair market value and negotiated at arm's length. DaVita's policy prohibits improperly accepting, soliciting or providing kickbacks of any kind. A kickback is an improper payment, gift, service, or item of value offered or received in return for increased

business or patient referrals. We are all responsible for complying with DaVita's Anti-kickback policies and all Anti-kickback laws that apply to our business.

102.    The Code of Conduct provides, as to "Marketing and Advertising Practices," that: "We practice honest, straightforward and non-deceptive marketing techniques.  Consistent with laws and regulations, we may use marketing and advertising activities to educate the public, increase awareness of our services and recruit teammates."

103.    The Code of Conduct provides, as to "Charitable Contributions," that:

Charitable contributions may be made to outside charities, on DaVita's behalf, with proper approvals from D-COMM in the U.S. or Team Quest outside the U.S. We do not participate in charitable activities or make charitable contributions to improperly induce referrals, to illegally gain an unfair business advantage, or in violation of the law.

Because we are a Village, we help each other and our greater community. We are encouraged to volunteer for charitable activities. However, no person may pressure another to do so. We may also participate in non-DaVita-sponsored charitable activities as long as it does not affect our work.

104.    In violation of the Code of Ethics and the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's internal controls and of the Company's engagement in the Fraudulent Insurance Misconduct, including the scheme to issue materially false and misleading statements to the public as part of the AKF Fraud, and facilitated and disguised the Individual Defendants' violations of law, including breaches of fiduciary duty, insider transactions, waste of corporate assets, and unjust enrichment.  In violation of the Code of Ethics and the Code of Conduct, the Individual Defendants who are members of the Board consciously disregarded their duties of loyalty, ethics, to act in the best interests of the Company, to use their free access to management to obtain all information necessary to fulfill their duties, and to assess their own performance as well as the CEO's.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### The Fraudulent Insurance Misconduct

105.   The Individual Defendants engaged in and/or caused the Company to engage in the Fraudulent Insurance Misconduct.  The Fraudulent Insurance Misconduct is the basis for three government investigations conducted by the OIG, Texas-USAO, and Mass-USAO, respectively.

### The OIG Investigation

106.   On March 2015, JSA Healthcare Corporation ("JSA"), which is a subsidiary of one of DaVita's two major divisions, DaVita Medical Group ("DMG"), received a subpoena from the OIG related to an ongoing civil investigation concerning Medicare Advantage service providers' risk adjustment practices and data, which includes identification and verification of patient diagnoses and factors used in making the diagnoses.  The subpoena requests documents and information for the period from January 1, 2008 through December 31, 2013, for certain Medicare Advantage plans for which JSA provided services.  In addition, the subpoena requests information regarding JSA's communications about patient diagnoses as they relate to certain Medicare Advantage plans generally.

107.   DaVita also received a subpoena in June 2015 from the OIG, which sought production of a wide range of documents between the period from January 1, 2008 to the present, relating to the Company and its subsidiaries' provision of services to Medicare Advantage plans and related patient diagnosis coding and risk adjustment submissions and payments.  The investigation also concerns potential overpayments by the government to DaVita.  The subpoena also requests information specifically related to patient diagnosis coding practices for a number of conditions, including the potential improper historical DMG coding by the Company for a

particular condition.   Such improper diagnosis coding and risk adjustment submissions and payments would result in the Company being paid amounts by the government that it was not entitled to.

**Texas-USAO Investigation**

108.    In February 2016, one of the Company's pharmacy services' wholly-owned subsidiaries, DaVita Rx, received a Civil Investigation Demand ("CID") from the Texas-USAO. The investigation concerns violations of the False Claims Act, and it alleges that DaVita Rx presented or caused to be presented false claims for payment to the government for prescription medications.    The investigation also concerns DaVita's relationship with pharmaceutical manufacturers.  The CID covers the period from January 1, 2006 through the present.  Such false claims for payment related to the use of prescription medication and improper relationships with pharmaceutical manufacturers would result in the Company being paid amounts by the government that it was not entitled to.

**The Mass-USAO Investigation**

109.    As described further herein, on January 4, 2017, the Company was served with an administrative subpoena for records by the Mass-USAO, pertaining to an investigation into federal health care offenses.  The time period covered by the subpoena is from January 1, 2007 through the present, and requests documents relevant to charitable patient assistance organizations, especially the AKF.  The subpoena also seeks documents related to efforts to provide patients with information concerning the availability of charitable assistance.  The underlying conduct that is the subject of the investigation is the AKF Fraud, as discussed further herein.

**Background of the Company and the AKF Fraud**

110.    DaVita serves patients suffering from ESRD or chronic kidney failure by providing them with kidney dialysis services.  The Company provides acute inpatient dialysis services in about 900 hospitals in the United States, and related laboratory services.  DaVita also operates kidney dialysis centers and provides related lab services in outpatient dialysis centers. As of December 31, 2016, the Company provided dialysis and administrative services through a network of 2,350 outpatient dialysis centers in 46 states in the U.S. and the District of Columbia, serving a total of approximately 187,700 patients.

111.    The Company is divided into two main operating divisions: DaVita Kidney Care and DaVita Medical Group.  DaVita Kidney Care provides dialysis services to patients suffering from chronic kidney failure or ESRD while DaVita Medical Group manages and operates medical groups and affiliated physician networks.

112.    When DaVita provides one session of dialysis to patients suffering from ESRD, the Company will typically bill commercial insurers more than $4,000 for such services. However, for Medicaid and Medicare-eligible patients, Medicaid and Medicare will only pay the Company reimbursement rates of $300 or less for the same service.  Thus, the Company would increase their revenue if more of their patients had private, commercial insurance.  Notably, the Company's revenues derived from private insurance companies was substantially responsible for the Company's profits.

113.    In fact, despite that patients who had commercial health insurance only generated 34% of the Company's total dialysis services revenue in 2015, nearly all of DaVita's profits were derived from commercial payors.  In light of these significant incentives, the Individual Defendants caused the Company to utilize deceptive and unlawful means to systematically target patients with government-subsidized health insurance and convince them to enroll in private,

commercial insurance and reject or drop the affordable government insurance options available to them.

114.     As part of their fraudulent scheme, the Company informed patients currently enrolled in Medicare and Medicaid that the AKF, a third party charitable 501(c)(3) payor, would cover their monthly health insurance premiums, seeking to have the Medicare and Medicaid patients obtain private insurance and coverage that would typically be untenable for them financially.   This option was only available because DaVita and its Competitors illegally funneled money to the AKF, who then used the funds to reimburse the patients' health care premiums.   The AKF only funded insurance for dialysis for patients with ESRD, and did not fund insurance for alternative treatments.   Of note, DaVita would only benefit from the AKF funding insurance for dialysis, and not for alternative treatments for patients with ESRD.

115.     Thus, as part of this scheme, beginning from at least August 4, 2015, and in breach of their fiduciary duties owed to DaVita, the Individual Defendants caused the Company to: (1) engage in a fraudulent scheme to steer patients into unnecessary private insurance plans in order to maximize profits, which was accomplished through the use of the AKF; (2) fail to disclose the true nature of its relationship with the AKF; (3) fraudulently obtain revenues and profits through the fraudulent scheme; (4) include such fraudulently derived revenue in its financial reports; (5) fail to maintain effective internal controls; and (6) make, or themselves made, false and/or misleading statements and/or omissions of material fact regarding the fraudulent scheme.

## **False and Misleading Statements During the AKF Fraud**

116.     As a result of the foregoing, and as described further below, the Company's public statements were materially false and misleading at all relevant times beginning on, at

least, August 4, 2015.  The Individual Defendants failed to correct and/or caused the Company to

fail to correct these false and/or misleading statements and/or omissions of material fact,

rendering them personally liable to the Company for breaching their fiduciary duties.

### August 4, 2015 Press Release

117.    On August 4, 2015, the Company issued a press release titled "DaVita HealthCare

Partners Inc. 2nd Quarter 2015 Results," where it announced financial results for the second

fiscal quarter ended June 30, 2015, including consolidated net revenues of $3.44 billion.  The

press release, however, failed to disclose: (1) the Company's engagement in the AKF Fraud and

the true nature of the Company's relationship with the AKF, including that their contributions to

the AKF were made with the singular intention of fraudulently steering Medicare and Medicaid-

covered patients to commercial insurers; (2) and thus, the revenues they reported were

misleading because they were derived in part from insurance plans where the AKF was

improperly paying for patients' health care premiums through proceeds in fact provided to them

by the Company; and (3) that the Company's internal controls were not effectively maintained.

118.    Instead, the press release noted, in relevant part:

DaVita HealthCare Partners Inc. (NYSE: DVA) today announced results for the
quarter ended June 30, 2015. Adjusted net income attributable to DaVita
HealthCare Partners Inc. for the three months ended June 30, 2015 was $207
million, or $0.95 per share, excluding after-tax debt redemption charges of
approximately $29 million, or $0.13 per share, and a tax adjustment related to the
settlement of the Vainer private civil suit (the Vainer suit) of approximately $8
million, or $0.04 per share. Net income attributable to DaVita HealthCare
Partners Inc. for the three months ended June 30, 2015 including these items
was $170 million, or $0.78 per share.

* * *

**Outlook**

- We are updating the low end of our consolidated operating income for 2015 to
  now be in the range of $1.825 billion to $1.925 billion.

Our previous consolidated operating income guidance for 2015 was in the range of $1.800 billion to $1.925 billion.

▪ We are also updating the low end of our operating income for Kidney Care for 2015 to now be in the range of $1.600 billion to $1.650 billion.

Our previous operating income guidance for Kidney Care for 2015 was in the range of $1.575 billion to $1.650 billion.

▪ We still expect our operating income for HCP for 2015 to be in the range of $225 million to $275 million.

We are updating our consolidated operating cash flow for 2015 to now be in the range of $1.600 billion to $1.750 billion.

▪ Our previous consolidated operating cash flow for 2015 was in the range of $1.500 billion to $1.700 billion.

## August 5, 2015 Form 10-Q

119.    On August 5, 2015, DaVita filed a quarterly report for the fiscal quarter ended June 30, 2015 on a Form 10-Q with the SEC (the "2Q 2015 10-Q"), which was signed by Defendant Hilger.  The 2Q 2015 10-Q reiterated substantially the same results announced in the August 4, 2015 press release.   In it, the Individual Defendants failed to disclose: (1) the Company's engagement in the AKF Fraud and the true nature of the Company's relationship with the AKF, including that their contributions to the AKF were made with the singular intention of fraudulently steering Medicare and Medicaid-covered patients to commercial insurers; (2) and thus, the revenues they reported were misleading because they were derived in part from insurance plans where the AKF was improperly paying for patients' health care premiums through proceeds in fact provided to them by the Company; and (3) that the Company's internal controls were not effectively maintained.

120.    Attached to the 2Q 2015 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) of the Exchange Act, Section 302 of the Sarbanes-Oxley Act of 2002 ("Sox"), and 18

U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sox, ("Sox Certifications"), signed by Defendants Thiry and Hilger, attesting to the accuracy of the 2Q 2015 10-Q.

**November 3, 2015 Press Release**

121.   On November 3, 2015, the Company issued a press release titled "DaVita HealthCare Partners Inc. 3rd Quarter 2015 Results," where it announced financial results for the third fiscal quarter ended September 30, 2015, including consolidated net revenues of $3.53 billion.   The press release, however, failed to disclose: (1) the Company's engagement in the AKF Fraud and the true nature of the Company's relationship with the AKF, including that their contributions to the AKF were made with the singular intention of fraudulently steering Medicare and Medicaid-covered patients to commercial insurers; (2) and thus, the revenues they reported were misleading because they were derived in part from insurance plans where the AKF was improperly paying for patients' health care premiums through proceeds in fact provided to them by the Company; and (3) that the Company's internal controls were not effectively maintained.

122.   Instead, the press release noted, in relevant part:

DaVita HealthCare Partners Inc. (NYSE: DVA) today announced results for the quarter ended September 30, 2015. Net income attributable to DaVita HealthCare Partners Inc. for the three months ended September 30, 2015 was $216 million, or $1.00 per share.

\* \* \*

**Outlook**

▪  We are updating our consolidated operating income for 2015 to now be in the range of $1.870 billion to $1.915 billion.

   Our previous consolidated operating income guidance for 2015 was in the range of $1.825 billion to $1.925 billion.

- We are also updating our operating income for Kidney Care for 2015 to now be in the range of $1.630 billion to $1.655 billion.

  Our previous operating income guidance for Kidney Care for 2015 was in the range of $1.600 billion to $1.650 billion.

- We are updating our operating income for HCP for 2015 to now be in the range of $240 million to $260 million.

  Our previous operating income guidance for HCP for 2015 was in the range of $225 million to $275 million.

- We are updating our consolidated operating cash flows for 2015 to now be in the range of $1.675 billion to $1.775 billion.

  Our previous consolidated operating cash flow for 2015 was in the range of $1.600 billion to $1.750 billion.

**November 5, 2015 Form 10-Q**

123.    On November 5, 2015, DaVita filed a quarterly report for the fiscal quarter ended September 30, 2015 on a Form 10-Q with the SEC (the "3Q 2015 10-Q"), which was signed by Defendant Hilger.  The 3Q 2015 10-Q reiterated substantially the same results announced in the November 3, 2015 press release.  In it, the Individual Defendants failed to disclose: (1) the Company's engagement in the AKF Fraud and the true nature of the Company's relationship with the AKF, including that their contributions to the AKF were made with the singular intention of fraudulently steering Medicare and Medicaid-covered patients to commercial insurers; (2) and thus, the revenues they reported were misleading because they were derived in part from insurance plans where the AKF was improperly paying for patients' health care premiums through proceeds in fact provided to them by the Company; and (3) that the Company's internal controls were not effectively maintained.

124.    Attached to the 3Q 2015 10-Q were Sox Certifications signed by Defendants Thiry and Hilger, attesting to the accuracy of the 3Q 2015 10-Q.

**February 11, 2016 Press Release**

125.     On February 11, 2016, the Company issued a press release titled "DaVita HealthCare Partners Inc. 4th Quarter 2015 Results," where it announced financial results for the fiscal quarter and year ended December 31, 2015, including consolidated net revenues of $13.78 billion for the year.     The press release, however, failed to disclose: (1) the Company's engagement in the AKF Fraud and the true nature of the Company's relationship with the AKF, including that their contributions to the AKF were made with the singular intention of fraudulently steering Medicare and Medicaid-covered patients to commercial insurers; (2) and thus, the revenues they reported were misleading because they were derived in part from insurance plans where the AKF was improperly paying for patients' health care premiums through proceeds in fact provided to them by the Company; and (3) that the Company's internal controls were not effectively maintained.

126.     Instead, the press release noted, in relevant part:

DaVita HealthCare Partners Inc. (NYSE: DVA) today announced results for the quarter and year ended December 31, 2015. Adjusted net income attributable to DaVita HealthCare Partners Inc. for the quarter ended December 31, 2015 was $214 million, or $1.01 per share, excluding estimated non-cash goodwill and other intangible asset impairment charges, as discussed below, and an estimated accrual for damages and liabilities associated with our pharmacy business, all after-tax. Net loss attributable to DaVita HealthCare Partners Inc. for the quarter ended December 31, 2015 including these items was $(6) million, or $(0.03) per share.

Adjusted net income attributable to DaVita HealthCare Partners Inc. for the year ended December 31, 2015 was $828 million, or $3.83 per share, excluding estimated non-cash goodwill and other intangible asset impairment charges, an estimated accrual for damages and liabilities associated with our pharmacy business, debt redemption charges and a settlement charge related to the Vainer private civil suit, all after-tax. Net income attributable to DaVita HealthCare Partners Inc. for the year ended December 31, 2015 including these items was $270 million, or $1.25 per share.

* * *

**Outlook**

- We expect our consolidated operating income for 2016 to be in the range of $1.800 billion to $1.950 billion.

- We expect our operating income for Kidney Care for 2016 to be in the range of $1.625 billion to $1.725 billion.

- We expect our operating income for HCP for 2016 to be in the range of $175 million to $225 million.

- We expect our consolidated operating cash flows for 2016 to be in the range of $1.550 billion to $1.750 billion.

**February 26, 2016 Form 10-K**

127.    On February 26, 2016, DaVita filed an annual report for the fiscal year ended December 31, 2015 on a Form 10-K with the SEC (the "2015 10-K"), which was signed by Defendants Thiry, Hilger, Arway, Berg, Davidson, Desoer, Diaz, Grauer, Nehra, Roper, and Valine.  The 2015 10-K reiterated substantially the same results announced in the February 11, 2016 press release.  In it, the Individual Defendants failed to disclose: (1) the Company's engagement in the AKF Fraud and the true nature of the Company's relationship with the AKF, including that their contributions to the AKF were made with the singular intention of fraudulently steering Medicare and Medicaid-covered patients to commercial insurers; (2) and thus, the revenues they reported were misleading because they were derived in part from insurance plans where the AKF was improperly paying for patients' health care premiums through proceeds in fact provided to them by the Company; and (3) that the Company's internal controls were not effectively maintained.

128.    The 2015 10-K also noted, relevantly:

Our overall financial performance was once again strong for 2015, excluding certain non-GAAP items, and was characterized by solid treatment volume growth, primarily from non-acquired growth at existing and new dialysis centers,

cost control initiatives, and productivity and payor mix improvements in our dialysis business, and solid growth in HCP's adjusted operating income.

129.    Attached to the 2015 10-K were Sox Certifications signed by Defendants Thiry and Hilger, attesting to the accuracy of the 2015 10-K.

**February 11, 2016 Conference Call**

130.    On February 11, 2016, the Company held an investor conference call discussing DaVita's fourth quarter 2015 results.  During the conference call, Defendant Thiry addressed the fact that the Company's full year 2016 guidance was affected, emphasizing that it was hurt by the "unfortunate fact" that Medicare reimbursements would remain flat for the third straight year. Specifically, Defendant Thiry stated:

> I'll go right into guidance. We anticipate in 2016 another solid year, $1.625 billion to $1.725 billion. Of course, there's always risk, we'll fall short and there's always hope that we will exceed. This guidance, per our normal customs, does include the international economics, and it also includes the unfortunate fact of flat Medicare reimbursement for the third straight year.

> The uncertainty in our 2016 performance, as in many recent years, centers on revenue and revenue per treatment. We anticipate our performance in the first half of the year with respect to [revenue per treatment] to be positive, but we have a lot less visibility into the second half of the year, hence the broadness of the range. And regarding the strategic initiatives, there could be some earnings volatility there.

131.    During the question-and-answer portion of the conference call, Kevin K. Ellich of Piper Jaffray & Co. had the following exchange with Defendant Thiry, regarding "reaccelerating" the Company's growth after years of inconsequential growth:

> [Kevin Ellich]

> Good afternoon. Thanks for taking the questions. Kent, I guess just kind of big picture, thinking about the guidance, which historically you've had a track record of being conservative. But if you look over the last few years, we haven't seen much growth in operating income. I guess, clearly, there has been some issues with HealthCare Partners. But I guess, broadly speaking, what will it take to get growth reaccelerating?

[Defendant Thiry]

A very fair question, Kevin, and one that we are pretty intense about on the inside. On the Kidney Care front, with that flat Medicare reimbursement that's just a real problem that we've got to get addressed . . . .

132.    During the conference call, the Individual Defendants failed to disclose: (1) the Company's engagement in the AKF Fraud and the true nature of the Company's relationship with the AKF, including that their contributions to the AKF were made with the singular intention of fraudulently steering Medicare and Medicaid-covered patients to commercial insurers; (2) and thus, the revenues they reported were misleading because they were derived in part from insurance plans where the AKF was improperly paying for patients' health care premiums through proceeds in fact provided to them by the Company; and (3) that the Company's internal controls were not effectively maintained.

**May 4, 2016 Press Release**

133.    On May 4, 2016, the Company issued a press release titled "DaVita HealthCare Partners Inc. 1st Quarter 2016 Results," where it announced financial results for the fiscal quarter ended March 31, 2016, including consolidated net revenues of $3.58 billion.  The press release, however, failed to disclose: (1) the Company's engagement in the AKF Fraud and the true nature of the Company's relationship with the AKF, including that their contributions to the AKF were made with the singular intention of fraudulently steering Medicare and Medicaid-covered patients to commercial insurers; (2) and thus, the revenues they reported were misleading because they were derived in part from insurance plans where the AKF was improperly paying for patients' health care premiums through proceeds in fact provided to them by the Company; and (3) that the Company's internal controls were not effectively maintained.

134.    Instead, the press release noted, in relevant part:

DaVita HealthCare Partners Inc. (NYSE: DVA) today announced results for the quarter ended March 31, 2016. Adjusted net income attributable to DaVita HealthCare Partners Inc. for the quarter ended March 31, 2016 was $190 million, or $0.92 per share, excluding a goodwill impairment charge, as discussed below, and an estimated accrual for damages and liabilities associated with our HCP Nevada hospice business, all net of tax. Net income attributable to DaVita HealthCare Partners Inc. for the quarter ended March 31, 2016 including these items was $97 million, or $0.47 per share.

* * *

**Outlook**

- We still expect our consolidated operating income for 2016 to be in the range of $1.800 billion to $1.950 billion.

- We still expect our operating income for Kidney Care for 2016 to be in the range of $1.625 billion to $1.725 billion.

- We still expect our operating income for HCP for 2016 to be in the range of $175 million to $225 million.

- We still expect our consolidated operating cash flow for 2016 to be in the range of $1.550 billion to $1.750 billion.

## May 4, 2016 Form 10-Q

135.    On May 4, 2016, DaVita filed a quarterly report for the fiscal quarter ended March 31, 2016 on a Form 10-Q with the SEC (the "1Q 2016 10-Q"), which was signed by Defendant Hilger.  The 1Q 2016 10-Q reiterated substantially the same results announced in the May 4, 2016 press release.  In it, the Individual Defendants failed to disclose: (1) the Company's engagement in the AKF Fraud and the true nature of the Company's relationship with the AKF, including that their contributions to the AKF were made with the singular intention of fraudulently steering Medicare and Medicaid-covered patients to commercial insurers; (2) and thus, the revenues they reported were misleading because they were derived in part from insurance plans where the AKF was improperly paying for patients' health care premiums

through proceeds in fact provided to them by the Company; and (3) that the Company's internal controls were not effectively maintained.

136.     Attached to the 1Q 2016 10-Q were Sox Certifications signed by Defendants Thiry and Hilger, attesting to the accuracy of the 1Q 2016 10-Q.

**The 2016 Proxy Statement**

137.     On May 10, 2016, the Company filed the 2016 Proxy Statement with the SEC. The 2016 Proxy Statement contained, *inter alia*, an advisory vote on executive compensation and a vote on the election of directors.  The 2016 Proxy Statement stated, with regard to executive compensation:

> As disclosed in the Compensation Discussion and Analysis, the Company believes that its executive compensation program is reasonable, competitive and strongly focused on pay-for-performance principles. We design our executive officer compensation program to attract and retain outstanding leaders who possess the skills and talent necessary to achieve our business goals and objectives. Our ultimate objective is to continue to create long-term stockholder value by being a leader in clinical outcomes, generating strong overall revenue growth, market share increases, operating margin growth, increases in Medicare Advantage enrollment and consistently strong total stockholder return ("TSR"). In order to achieve this objective, we have established an executive compensation program that we believe:
>
> ▪ rewards superior clinical outcomes;
> ▪ rewards strong Company performance;
> ▪ aligns our executives' interests with our stockholders' interests; and
> ▪ is competitive within the health care services, diagnostics, managed care and solutions markets, so that we can attract and retain outstanding executives.
>
> We believe that the compensation of our named executive officers during fiscal 2015 is consistent with the following achievements and financial performance for 2015:
>
> ▪ improved clinical outcomes in our U.S. dialysis operations, including second year in a row as leader of the Five-Star Quality Rating System created by the Centers for Medicare and Medicaid Services;
> ▪ consolidated net revenue growth of 7.7%;
> ▪ net revenue growth of 5.2% related to our U.S. dialysis segment operations as a result of an increase in revenue per treatment of $6;

- an increase in HCP's net revenue of 9.6% related to an increase of its fee-for-service business and senior capitated revenue;
- an increase in other ancillary services and strategic initiatives net revenue of 21.3%;
- U.S. dialysis treatment growth of 4.1%;
- normalized non-acquired U.S. dialysis treatment growth of 3.9%;
- net addition of 72 U.S. dialysis centers and 27 international dialysis centers;
- strong operating cash flows of $1.557 billion, which have been reduced by approximately $304 million of after-tax payments made in connection with the settlement of the Vainer private civil suit; and
- a $1.5 billion financing to lower interest rate, extend maturities and enhance liquidity.

The Company's TSR from the first quarter of 2000 (our CEO's first full quarter with the Company) through the fourth quarter of 2015 was approximately 3,298%, putting the Company in the top 10 of all current S&P 500 companies over that period.

The Compensation Committee has developed and approved an executive compensation philosophy to provide a framework for the Company's executive compensation program featuring the following policies and practices:

- strong pay-for-performance alignment, with equity awards ranging up to 65% of our named executive officers' compensation in 2015, and with short-term cash bonuses and long-term incentive awards of cash and equity tied to the achievement of various performance metrics;
- a stock ownership policy that requires our executives to accumulate a meaningful ownership stake in the Company over time to strengthen the alignment of our named executive officers' and stockholders' interests;
- a clawback policy that permits the Board to recover bonuses, incentive and equity-based compensation from executive officers and members of the Board whose fraud or intentional misconduct was a significant contributing factor to the Company having to restate all or a portion of its financial statements; and
- equity incentive plans that prohibit repricing or replacing underwater stock options or stock appreciation rights without prior stockholder approval.

138.   The statements made in the 2016 Proxy Statement with regard to executive compensation were false and misleading because they purported to employ "pay-for-performance" elements while failing to disclose that the Company's revenues and profits, and therefore its financial performance, were based on unlawful activity and therefore any

compensation based on the Company's financial performance was also based on the unlawful activity.

139.   Moreover, the 2016 Proxy Statement stated that the Code of Ethics and the Code of Conduct apply to certain of the Company's employees, and was thus false and misleading by not noting that the Individual Defendants had violated the Code of Ethics and the Code of Conduct.

140.   The 2016 Proxy Statement also failed to disclose that the Individual Defendants caused the Company to: (1) engage in a fraudulent scheme to steer patients into unnecessary private insurance plans in order to maximize profits, which was accomplished through the use of the AKF; (2) conceal the true nature of its relationship with the AKF; (3) obtain fraudulently obtained revenues and profits through the fraudulent scheme; (4) include such fraudulently derived revenue in its financial reports; (5) fail to maintain effective internal controls; and (6) make, or themselves made, false and/or misleading statements and/or omissions of material fact regarding the fraudulent scheme.

## The Truth Emerges

### UnitedHealth's Lawsuit Against ARAH

141.   On July 1, 2016, UnitedHealth filed a lawsuit in the United States District Court for the Southern District of Florida against ARAH, suing it for fraud.   In its complaint, UnitedHealth alleged that ARAH engaged in an illegal scheme to unlawfully obtain benefit payments from UnitedHealth for the rendering of dialysis services to patients suffering from ESRD or chronic kidney disease.   UnitedHealth further accused ARAH of systematically targeting Medicaid and Medicare-eligible patients and convincing them to drop or reject the affordable government insurance options available to them and to enroll in UnitedHealth's commercial plans by using unlawful and deceptive means.   Additionally, its complaint alleged

that ARAH charged some of its patients $4,000 per treatment when Medicare and Medicaid plans would typically provide for reimbursement at less than 10% of that rate. UnitedHealth's complaint alleged, in relevant part:

> 1. This action involves a fraudulent and illegal scheme by ARA – one of the country's largest providers of dialysis services – to unlawfully obtain benefit payments from United for dialysis services rendered to vulnerable patients suffering from chronic kidney disease.

> 2. ARA has directed its deceptive conduct at United and United's commercial health insurance plans, and has caused United to make substantial payments to ARA that United would not have made had ARA acted truthfully and lawfully. ARA has preyed upon some of Florida's and Ohio's most vulnerable patients – ones suffering from end-stage renal disease ("ESRD") – converting them from patients to pawns in a scheme to maximize ARA's profits.

> 3. In fact, since the beginning of the year, ARA has systematically targeted these Medicaid- and Medicare-eligible patients and, through deception and unlawful means, has convinced them to drop or reject their affordable government insurance options and enroll in United's commercial plans.

> 4. The lone motivating factor behind ARA's patient conversion efforts is ARA's desire to maximize its own profits.

> 5. Medicaid and Medicare pay ARA a reimbursement rate of $300 or less for one session of dialysis services rendered to an ESRD patient (the Medicaid rates in Florida and Ohio are less than $200 for one session of dialysis services).

> 6. ARA is an out-of-network provider, rather than an "in-network" provider, for United's commercial plans. This means ARA does not have a contractually agreed upon rate for dialysis services rendered to patients insured under those plans. As an out-of-network provider, ARA believes it can bill United at rates that are as much as twenty times the rates it would receive from Medicaid and/or Medicare. As described below, ARA's out-of-network status has made United's commercial plans a particularly attractive target for ARA's scheme.

> 7. Knowing of its out-of-network status with United plans, and believing that it can bill United more than $4,000 *for the same services* being rendered to Medicaid and Medicare-eligible ESRD patients, ARA has endeavored to cause those patients to drop their government insurance and enroll in United's commercial plans. For at least the past year, ARA has succeeded, causing many ESRD patients to move off of or away from Medicaid and/or Medicare and onto a commercial plan offered by United. ARA has then submitted charges to United

seeking to be paid benefits for dialysis services rendered to those patients that exceed by a factor of more than twenty times the reimbursement amount ARA would receive were it to bill certain government insurance plans for those services.

142.    UnitedHealth's complaint continued:

8.    To implement its scheme against United, ARA needed to overcome the financial limitations of the vulnerable patient population ARA wanted to use to increase its profits. Specifically, ARA needed to figure out how to convince ESRD patients (many of whom are indigent, and who, under their Medicaid and Medicare plans, had little to no personal financial responsibility for their medical and pharmaceutical benefits) to take on the premium, copay, coinsurance and deductible obligations associated with United commercial plans.

9.    The solution ARA implemented was deceptive, fraudulent, and illegal.

10.    *First*, ARA secured premium assistance from a third-party, the American Kidney Fund ("AKF"), to cover the patients' commercial plan premiums. Upon information and belief, AKF's financial assistance was funded by earmarked donations ARA made to the 501(c)(3) organization for this very purpose.

11.    *Second*, ARA counseled patients and assisted them with enrollment in the commercial plans that were most favorable to ARA—i.e., plans that would result in the highest out-of-network reimbursement to ARA.

12.    *Third*, ARA illegally, and in violation of the language of the applicable commercial plans, waived the patients' copay, coinsurance and deductible obligations to ARA.

13.    Patients suffered in two ways as a result of ARA's scheme. *First*, upon information and belief, ARA intentionally failed to inform patients that AKF's premium assistance program was only available for patients receiving dialysis treatments and, consequently, none of the patients knew that they would be ineligible for premium assistance if they sought to cure their condition through a kidney transplant. *Second*, while *ARA* illegally agreed to waive the copays, coinsurance and deductibles patients owed to it, it could not guarantee that the patients' doctors, pharmacists, medical equipment suppliers, and other service providers would similarly break the law by doing the same.

14.    ARA's actions violated several important criminal and civil laws, including Florida's prohibitions on false and fraudulent insurance claims (Fla. Stat. § 817.234), Florida's Patient Brokering Act (Fla. Stat. § 817.505), Florida's

Anti-Kickback Statute (Fla. Stat. § 456.054), and Florida's Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201 et seq.) ("FDUTPA").

15.     Because ARA used unlawful means to move vulnerable ESRD patients onto commercial United plans, the services and treatments ARA provided to these patients after it implemented its scheme were not lawful when rendered and were, therefore, ineligible for reimbursement.

16.     United has already paid millions of dollars in benefits to ARA for claims ARA submitted as part of its illegal and unethical conversion and billing scheme.

143.    The scheme alleged in UnitedHealth's suit against ARAH bears a striking resemblance to the scheme alleged herein.  In fact, part of the scheme alleged in UnitedHealth's suit involved the AKF.

144.    As further alleged in the UnitedHealth complaint, the AKF would provide ARAH with premium assistance in order to cover certain low-income patients' commercial plan premiums.  The financial assistance provided by the AKF was funded by earmarked donations that ARAH made to the AKF for exactly this purpose.  Moreover, ARAH counseled and assisted patients with enrolling in commercial plans that would best serve ARAH's financial interests and waived the patients' coinsurance, copay, and deductible obligations to ARAH, in violation applicable commercial plans.  Consequently, UnitedHealth would not have any choice but to pay ARAH's inflated out-of-network charges.  As a result of ARAH's practice of targeting patients already on dialysis and steering them into UnitedHealth insurance policies, the insured patient population was skewed and it became impossible for UnitedHealth to establish premiums based on its assessment of the general population's need for dialysis.  ARAH's scheme additionally had the effect of increasing health care costs for all insured patients.

145.    Although DaVita was not a party to the UnitedHealth lawsuits, ARAH is an industry peer of the Company and DaVita similarly made substantial contributions to the AKF.

DaVita additionally had ties to the AKF through the Chair of the AKF's Board of Trustees, Gail S. Wick, who served as vice president for nursing services at DaVita, and was responsible for the nursing care, manpower, and practice for over 540 dialysis facilities throughout the U.S.

146.    On July 1, 2016, *The New York Times* published an article regarding the UnitedHealth lawsuit against ARAH, noting "[t]hat the gaping price difference was the motivation for a scheme, orchestrated by a for-profit dialysis chain, that illegally pushed poor people . . . out of inexpensive government programs and into expensive private plans sold by UnitedHealthcare."  The article additionally noted, with regard to the AKF:

> The [AKF] has close ties to the dialysis industry: It acknowledges that dialysis companies pay for its premium-assistance program, and in 2015, 78 percent of its $264 million in revenue came from two companies, according to its financial disclosures. The kidney fund declined to name the companies. The organization's chairwoman is a former executive at DaVita and Fresenius Medical Care, the nation's two leading dialysis chains.

> Those industry ties expose the profit motive that underpins the programs, according to Patrick Burns, executive director of Taxpayers Against Fraud, a whistle-blower advocacy group.

> "There is a bottom line here, and the people who manage these programs are well aware of it, on both sides," he said.

**August 8, 2016 Press Release and Conference Call**

147.    On August 8, 2016, the Company issued a press release titled "DaVita HealthCare Partners Inc. 2nd Quarter 2016 Results," providing its financial results for the second fiscal quarter ended June 30, 2016, including consolidated net revenues of $3.72 billion and net income of $53 million, both of which exceeded analysts' expectations.  Notably, however, the Company slashed its full-year consolidated operating income guidance from an earlier forecasted range of $1.8 billion to $1.95 billion, to $1.785 billion to $1.875 billion.

148.   On the same day, the Company held an investors conference call discussing DaVita's second quarter 2016 results.  During the conference call, DaVita Kidney Care's CEO, Javier J. Rodriguez, indicated per the line of questioning that DaVita had been donating money to the AKF, specifically stating "we have been donating and so have all other providers to help patients with end-stage renal disease for decades in order to be assisted with their premium."

149.   The following exchange between John W. Ransom of Raymond James & Associates, Inc. and Defendant Thiry also took place with regard to the AKF:

[John W. Ransom]

Just to push back a little bit on this foundation issue. I mean, these patients, would be covered by Medicare. It's not as though they would be bereft to health insurance or then – I think, I've read 5,500 or so patients are now on exchanges, being paid full by the foundations. I mean, aren't you arguing that United Healthcare and Anthem should take, I don't know, $5,000-$10,000 in premium and have a fair cost of over $100,000?

I mean, how can we make that argument to these plans, when they could be covered under the public plans that's and I would assume, you guys have your proportional share of the 5,500, just stepping back from kind of a public policy standpoint. How do you, at a time when the plans are losing money in the exchanges, how do you argue to them that they should cover people that could be covered for a fraction of the cost under Medicare?

[Defendant Thiry]

Yeah. A couple of things. If you're on Medicare, you're not eligible, as we go on the exchange. And so, that is the benefit that you have. For the patients, that switch, I don't know, if the number you cited is right or not, we haven't disclosed those numbers. It is a very personal decision that is based on access to specialists, drugs, and other things. So, the patient actually do [sic] get differentiated care.

And so the reality of this thing is that the system, set it up for individuals to make a choice as to what their best coverage is and so patients made that choice, and it's a very personal decision that I can't decide whether that's right or wrong for the system, but rather they get to make the choice.

150.   On August 8, 2016, the price per share of DaVita stock at closing was $75.36.  On August 9, 2016, the day after the August 8, 2016 press release was issued and conference call

was held, in response to the news, the price per share of DaVita stock at closing fell to $72.31. At the close of market on August 10, 2016, the price per share of DaVita stock fell further to $70.11.

### The CMS Request for Information

151.    On August 18, 2016, the CMS issued a request for information "seeking public comment on concerns that some health care providers and provider-affiliated organizations may be steering people eligible for, or receiving, Medicare and/or Medicaid benefits into Affordable Care Act-compliant individual market plans . . . for the purpose of obtaining higher reimbursement rates." The request for information specifically sought public comment:

> regarding concerns about health care providers and provider-affiliated organizations steering people eligible for or receiving Medicare and/or Medicaid benefits to an individual market plan for the purpose of obtaining higher payment rates. CMS is concerned about reports of this practice and is requesting comments on the frequency and impact of this issue from the public. We believe this practice not only could raise overall health system costs, but could potentially be harmful to patient care and service coordination because of changes to provider networks and drug formularies, result in higher out-of-pocket costs for enrollees, and have a negative impact on the individual market single risk pool (or the combined risk pool in states that have chosen to merge their risk pools). We are seeking input from stakeholders and the public regarding the frequency and impact of this practice, and options to limit this practice.

152.    CMS Acting Administrator Andy Slavitt noted, "We are concerned about reports that some organizations may be engaging in enrollment activities that put their profit margins ahead of their patients." He continued, "These actions can limit benefits for those who need them, potentially result in greater costs to patients, and ultimately increase the cost of Marketplace coverage for everyone." As such, the CMS request for information and related letters were focused on instances where Medicare or Medicaid patients were steered into Affordable Care Act-compliant plans, which had the potential to lead to the disruption of care associated with a change in network providers.

153.    The CMS, in addition to its request for information, was reportedly considering its regulatory and operational options to limit or altogether prohibit premium payments and routine waiver of cost-sharing for qualified health plans by health care providers, revisions to Medicare and Medicaid provider enrollment rules, and imposing civil monetary penalties on individuals who fail to provide correct information to consumers enrolled in a plan.  Moreover, the CMS anticipated potential changes which would allow insurers to limit their payment to health care providers to Medicare-based amounts for certain items of care and services.

154.    On August 18, 2016, the price per share of DaVita stock at closing was $67.65. On August 19, 2016, the day after the CMS issued its request for information and announced potential rule changes, in response to the news, the price per share of DaVita stock at closing fell to $64.48.

### The St. Louis Post-Dispatch Article

155.    On October 23, 2016, the *St. Louis Post-Dispatch* published an article titled "DaVita encouraged some low-income patients to enroll in commercial plans," and accused the Company of purposely and directly steering clients to private insurance providers.  The article cited internal DaVita emails that revealed that the Company "targeted some patients in a campaign to get them to buy insurance they didn't necessarily need, saying their monthly premiums would be paid by a nonprofit foundation."  This nonprofit foundation was the AKF.

156.    The article stated, in relevant part:

Internal emails from DaVita HealthCare Partners Inc. show the Denver-based company targeted some patients in a campaign to get them to buy insurance they didn't necessarily need, saying their monthly premiums would be paid by a nonprofit foundation.

DaVita, one of the nation's largest dialysis providers, with a major presence in St. Louis, had a financial incentive to get certain Medicaid-eligible dialysis patients to enroll in private insurance. Medicaid, the government-run health insurance

program for low-income Americans, pays significantly less than traditional commercial insurance for dialysis treatment.

Emily Bremer, a Clayton-based health insurance broker, said she first heard about kidney failure patients being targeted after one of her clients said he was encouraged by an employee of another dialysis-center company to enroll in a private insurance plan. Bremer said she was concerned because the plan described as best didn't include her client's current BJC HealthCare doctors and also had other limitations.

* * *

**Red flags**

Sudden spikes in payments to dialysis centers raised red flags for major health insurers, and they complained to the federal government. It was a significant financial hit they were not expecting.

"This is what's causing instability, and it's what's raising prices for everyone," a spokeswoman for America's Health Insurance Plans, an industry group, told the Post-Dispatch.

157.     The article continued:

**A coordinated effort**

Based on the company's internal emails, the difference between "steering" and "educating" is a subtle one. Those communications, sent during last year's open enrollment period, outline a systematic approach to "educate" hundreds of area patients — and thousands across the country — about individual health plans.

Those emails show that patients were told by DaVita dialysis center employees — either social workers or insurance counselors — that the American Kidney Fund would pay their monthly health insurance premiums so they could gain coverage that is usually out of reach financially. The DaVita employees were instrumental in helping patients enroll by helping complete applications for the plans and for the American Kidney Fund's health insurance premium assistance program. The initiative was referred to as the "Medicaid Opportunity" in internal emails.

In regulatory filings, DaVita says it contributes to the American Kidney Fund, but doesn't specify how much. In 2015, the fund provided about $255 million worth of patient assistance to 93,000 kidney failure patients, according to its most recent filing with the Internal Revenue Service.

DaVita's dialysis center employees were given information on which patients to target for the program. From there, they were supposed to engage Medicaid

patients in a conversation about new coverage options and the employees' progress was closely tracked.

Some advertising and brochure materials listed talking points for dialysis center employees. In bold large print, a brochure asked Medicaid patients: "What could additional coverage do for you?" The brochure went on to explain that the new coverage would improve access to transplants, to doctors that patients were "unable to see today" and to treatment when traveling out of state.

The brochure advertised the coverage as low to no cost and encouraged patients to reach out to social workers and insurance counselors to learn more.

The brochure boasted that patients may have access to an array of specialists if they opted for commercial coverage. The brochure included short testimonials from unnamed patients and workers, and included the statement: "This insurance is excellent. I haven't been denied anything, and it probably has saved my life."

158.    The article additionally stated:

The internal emails from last fall's open enrollment tally each region's performance. The emails show regions were tracked by how many patients were interested in commercial coverage and the percentage of those that had been talked to by employees about their options.

"Hooray! The Village has completed over 75% of interest conversations, and over 7,200 patients will receive enrollment education on the specific plans available in their market," an email said. (Village is the company's term for itself.)

The goal outlined in the emails was to hit 100 percent of "interest conversations" by late October.

However, "disinterested" patients were also tracked and their cases were reviewed by division vice presidents and regional operational directors, according to the emails.

The emails instructed that division leadership teams should conduct weekly or biweekly calls to discuss "validation" for patients who are not interested in this opportunity.

Anne Bailey, group vice president at DaVita, told the Post-Dispatch, "We had to be super organized and systematic." She explained that employees were instructed to talk to all patients during open enrollment so they could be informed of all their insurance options.

159.   On October 21, 2016, the last day the market was open prior to the publication of the *St. Louis Post-Dispatch* article, the price per share of DaVita stock at closing was $60.96. On October 24, 2016, the first day the market was open after the publication of the article, in responses to the news the price per share of DaVita stock at closing fell to $58.10.

### October 31, 2016 Press Release

160.   On October 31, 2016, the Company issued a press release titled "DaVita Announces Change for Medicaid Patients Seeking Affordable Care Act Plan Coverage," announcing that DaVita, effective immediately, was suspending support for applications to the AKF for charitable premium assistance by patients that were enrolled in minimum essential Medicaid coverage.   The Company estimated that a policy change that prevented patients with minimum essential Medicaid coverage from accessing charitable premium assistance "would result in a reduction to the Company's annualized operating income of up to approximately $140 million before any offsets."   The Company additionally noted, "If CMS were to issue a broader ruling that made access to charitable premium assistance unavailable to all ESRD patients on ACA Plans, the estimated financial impact would increase by up to $90 million, based on our estimate . . . ."

### January 6, 2017 Press Release

161.   On January 6, 2017, the Company issued a press release that announced that it had received a subpoena from the Mass-USAO, "seeking the production of information related to charitable premium assistance."   The same day, *The Wall Street Journal* published an article titled "Justice Department Probing Premium Assistance for Dialysis Patients."   The article stated that the DOJ is "probing a controversial arrangement under which kidney-care companies

support charitable efforts to help patients pay health-insurance premiums, according to disclosures from major dialysis providers."

162.    The statements referenced above were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business, operations, and internal controls, which were known to the Individual Defendants or recklessly disregarded by them.  During the period in which the AKF Fraud occurred, and in further breach of their fiduciary duties owed to DaVita, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact concerning the Company's: (1) engagement in a fraudulent scheme to steer patients into unnecessary private insurance plans in order to maximize profits, which was accomplished through the use of the AKF; (2) concealment of the true nature of its relationship with the AKF; (3) fraudulently gained revenues and profits through the fraudulent scheme; (4) inclusion of such fraudulently derived revenue in its financial reports; and (5) failure to maintain effective internal controls.

**Repurchases During the AKF Fraud**

163.    During the period in which the Company made false and or misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company.

164.    According to the Company's 3Q 2015 10-Q, during September 2015, the Individual Defendants caused the Company to repurchase 3,722,757 shares of its own common stock at an average price per share of approximately $74.55, for a total cost to the Company of $277.5 million.

165.     Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $16.45 more than the actual worth of each share during the month of September 2015.  Thus, the total over payment by the Company for its repurchases of its own stock during September 2015 was approximately $61.2 million.

166.     According to the Company's 2015 10-K, during the three months ended December 31, 2015, the Individual Defendants caused the Company to repurchase 2,156,951 shares of its own common stock at an average price per share of approximately $69.86, for a total cost to the Company of $150.6 million.

167.     Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $11.76 more than the actual worth of each share during the three months ended December 31, 2015.  Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended December 31, 2015 was approximately $25.3 million.

168.     According to the Company's 1Q 2016 10-Q, during the three months ended March 31, 2016, the Individual Defendants caused the Company to repurchase 3,689,738 shares of its own common stock at an average price per share of approximately $67.61, for a total cost to the Company of $249.4 million.

169.     Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $9.51 more than the actual worth of each share during the three months ended March 31, 2016.  Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended March 31, 2016 was approximately $35 million.

170.    According to the Company's 3Q 2016 10-Q, during the three months ended September 30, 2016 the Individual Defendants caused the Company to repurchase 6,240,694 shares of its own common stock at an average price per share of approximately $65.15, for a total cost to the Company of $406.5 million.

171.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $7.05 more than the actual worth of each share during the three months ended September 30, 2016.  Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended September 30, 2016 was approximately $43.9 million.

172.    In total, the Company overpaid an aggregate amount of more than $165.4 million for repurchases of its own stock during the period the Company made false and misleading statements and omissions.

## DAMAGES TO DAVITA

173.    As a direct and proximate result of the Individual Defendants' conduct, DaVita will lose and expend many millions of dollars.

174.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and CAO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

175.    Such costs include, but are not limited to, those incurred related to the investigations arising from the Fraudulent Insurance Misconduct.

176.    Such losses include, but are not limited to, more than $165.4 million that the Company overpaid, at the direction of the Individual Defendants, for its repurchases of its own stock at artificially inflated prices.

177.   Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

178.   As a direct and proximate result of the Individual Defendants' conduct, DaVita has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

179.   Plaintiff brings this action derivatively and for the benefit of DaVita to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of DaVita, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violation of Section 14(A) of the Exchange Act, as well as the aiding and abetting thereof.

180.   DaVita is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

181.   Plaintiff is, and has been continuously and at all relevant times, a shareholder of DaVita.  Plaintiff will adequately and fairly represent the interests of DaVita in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## **DEMAND FUTILITY ALLEGATIONS**

182.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

183.    A pre-suit demand on the Board of DaVita is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following twelve individuals: Individual Defendants Thiry, Arway, Berg, Davidson, Desoer, Diaz, Grauer, Nehra, Roper, Valine, and Yale, and non-party Pascal Desroches (collectively, the "Directors").  Plaintiff needs only to allege demand futility as to six of the twelve directors that were on the Board at the time this action was commenced.

184.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to engage in the Fraudulent Insurance Misconduct, and to make false and misleading statements and omissions of material facts, while they caused the Company to repurchase its own stock at artificially inflated prices and while six of them engaged in insider sales of Company stock based on material non-public information, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

185.    Demand is also excused as to all of the Directors because the unlawful business strategy that the Company engaged in was not a valid exercise of business judgment.  As the ultimate decision-making body of the Company, the Board made and/or allowed the Company to engage in the schemes outlined herein.

186.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the conduct alleged herein.  The fraudulent scheme was intended to

make the Company appear more stable, profitable, and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

187. Additional reasons that demand on Defendant Thiry is futile follow. Defendant Thiry was the Company's CEO at all relevant times, and is thus, as the Company admits, a non-independent director. Indeed, Defendant Thiry receives millions of dollars in compensation from the Company annually. For example, Defendant Thiry received total compensation of $12,296,671 for 2016. Defendant Thiry was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings and press releases. His large Company stock holding, worth approximately $150.6 million before the AKF Fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. His insider transactions before the AKF Fraud was exposed, which yielded approximately $25.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Thiry is a defendant in the Securities Class Action. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Fraudulent Insurance Misconduct and scheme to make false and misleading statements and/or omissions of material fact (he signed the 2015 10-K), consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Thiry breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

188.    Additional reasons that demand on Defendant Arway is futile follow.  Defendant Arway has served as a Company director since May 2009. She received lavish compensation, including $307,959 in 2016.  Moreover, Defendant Arway's large Company stock holding, worth approximately $6.5 million before the AKF Fraud was exposed, reveals her interest in keeping the Company's stock price as high as possible. Her insider transactions before the AKF Fraud was exposed, which yielded approximately $1.4 million in proceeds, demonstrate her motive in facilitating and participating in the fraud. As a trusted Company director, Chair of Compensation Committee, member of the Audit Committee, and member of the Nominating and Governance Committee, Defendant Arway conducted little, if any, oversight of the Company's engagement in the Fraudulent Insurance Misconduct and scheme to make false and misleading statements and/or omissions of material fact (she signed the 2015 10-K), consciously disregarded her duties to monitor engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Arway breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

189.    Additional reasons that demand on Defendant Berg is futile follow.  Defendant Berg has served as a Company director since March 2007.  Defendant Berg also serves as executive chairman of the Company's integrated healthcare business, DaVita Medical Group. Thus, Defendant Berg is beholden to and dependent on the Company and the Board for his employment. Indeed, the Company has admitted in its 2017 Proxy Statement that Defendant Berg is not considered an independent director under the NYSE listing rules.  He received lavish compensation, including $386,931 in 2016.  Moreover, Defendant Berg's large Company stock holding, worth approximately $5.6 million before the AKF Fraud was exposed, reveals his

interest in keeping the Company's stock price as high as possible. His insider transactions before the AKF Fraud was exposed, which yielded approximately $942,632 in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a trusted Company director, Defendant Berg conducted little, if any, oversight of the Company's engagement in the Fraudulent Insurance Misconduct and scheme to make false and misleading statements and/or omissions of material fact (he signed the 2015 10-K), consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Berg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

190. Additional reasons that demand on Defendant Davidson is futile follow. Defendant Davidson has served as a Company director since December 2010. He received lavish compensation, including $317,959 in 2016. Moreover, Defendant Davidson's large Company stock holding, worth approximately $3.6 million before the AKF Fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. His insider transactions before the AKF Fraud was exposed, which yielded approximately $322,757 in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a trusted Company director, Chair of the Audit Committee, member of the Nominating and Governance Committee, and member of the Clinical Performance Committee, Defendant Davidson conducted little, if any, oversight of the Company's engagement in the Fraudulent Insurance Misconduct and scheme to make false and misleading statements and/or omissions of material fact (he signed the 2015 10-K), consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Davidson

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

191.    Additional reasons that demand on Defendant Desoer is futile follow.  Defendant Desoer has served as a Company director since October 2015. She received lavish compensation, including $210,796 in 2016.   As a trusted Company director, Chair of the Compliance Committee, and member of the Clinical Performance Committee, Defendant Desoer conducted little, if any, oversight of the Company's engagement in the Fraudulent Insurance Misconduct and scheme to make false and misleading statements and/or omissions of material fact (she signed the 2015 10-K), consciously disregarded her duties to monitor engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Desoer breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

192.    Additional reasons that demand on Defendant Diaz is futile follow.  Defendant Diaz has served as a Company director since July 2007. He received lavish compensation, including $282,959 in 2016.  Moreover, Defendant Diaz's large Company stock holding, worth approximately $960,837 before the AKF Fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director, and a member of the Public Policy Committee, Defendant Diaz conducted little, if any, oversight of the Company's engagement in the Fraudulent Insurance Misconduct and scheme to make false and misleading statements and/or omissions of material fact (he signed the 2015 10-K), consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Diaz breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

193.    Additional reasons that demand on Defendant Grauer is futile follow.  Defendant Grauer has served as a Company director since August 1994. He received lavish compensation, including $355,959 in 2016.   Moreover, Defendant Grauer's large Company stock holding, worth approximately $11.3 million before the AKF Fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As the Company's trusted lead independent director, Chair of the Nominating and Governance Committee, and member of the Compensation Committee, Defendant Grauer conducted little, if any, oversight of the Company's engagement in the Fraudulent Insurance Misconduct and scheme to make false and misleading statements and/or omissions of material fact (he signed the 2015 10-K), consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Grauer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

194.    Additional reasons that demand on Defendant Nehra is futile follow.  Defendant Nehra has served as a Company director since November 2000. He received lavish compensation, including $290,459 in 2016.  Moreover, Defendant Nehra's large Company stock holding, worth approximately $13.6 million before the AKF Fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. His insider transactions before the AKF Fraud was exposed, which yielded approximately $1.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a trusted Company director, and Chair of the Public Policy Committee, Defendant Nehra conducted little, if any, oversight of the

Company's engagement in the Fraudulent Insurance Misconduct and scheme to make false and misleading statements and/or omissions of material fact (he signed the 2015 10-K), consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Nehra breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

195.    Additional reasons that demand on Defendant Roper is futile follow.  Defendant Roper has served as a Company director since May 2001. He received lavish compensation, including $280,459 in 2016.  Moreover, Defendant Roper's large Company stock holding, worth approximately $6.2 million before the AKF Fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director, Chair of the Clinical Performance Committee, and member of the Compliance Committee, Defendant Roper conducted little, if any, oversight of the Company's engagement in the Fraudulent Insurance Misconduct and scheme to make false and misleading statements and/or omissions of material fact (he signed the 2015 10-K), consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Roper breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

196.    Additional reasons that demand on Defendant Valine is futile follow.  Defendant Valine has served as a Company director since June 2006. He received lavish compensation, including $285,459 in 2016.  Moreover, Defendant Valine's large Company stock holding, worth approximately $7.4 million before the AKF Fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. His insider transactions before the AKF Fraud

was exposed, which yielded approximately $627,514 in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a trusted Company director, member of the Audit Committee, member of the Compensation Committee, and member of the Nominating and Governance Committee, Defendant Valine conducted little, if any, oversight of the Company's engagement in the Fraudulent Insurance Misconduct and scheme to make false and misleading statements and/or omissions of material fact (he signed the 2015 10-K), consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Valine breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

197.    Additional reasons that demand on Defendant Yale is futile follow.  Defendant Yale has served as a Company director since July 2016. She received lavish compensation, including $143,645 in 2016.  As a trusted Company director, member of the Compliance Committee, and member of the Public Policy Committee, Defendant Yale conducted little, if any, oversight of the Company's engagement in the Fraudulent Insurance Misconduct and scheme to make false and misleading statements and/or omissions of material fact (she signed the 2015 10-K), consciously disregarded her duties to monitor engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Yale breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

198.    Additional reasons that demand on the Board is futile follow.

199.    Demand in this case is excused because the Directors, all of whom but one are named as defendants in this action, and one of whom is a defendant in the Securities Class

Action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

200.    Additionally, the demand in this case is excused because the Directors violated the Company's Code of Conduct. Indeed, six of the twelve Directors engaged in egregious insider transactions while the stock price was inflated because of the false and misleading statements.

201.    Additionally, demand is excused as to Defendants Berg, Davidson, and Valine (the "Audit Committee Directors") due to their failure to uphold the Audit Committee Charter as members of the Audit Committee.  The Audit Committee Directors, pursuant to DaVita's Audit Committee Charter, were responsible for reviewing the Company's financial reports, ensuring that DaVita was in compliance with regulatory and legal requirements, and reviewing the integrity of the Company's internal controls.  By allowing the Company to make the false and misleading statements alleged herein and to engage in the Fraudulent Insurance Misconduct, in addition to allowing the internal control failures alleged herein, the Audit Committee Directors breached their fiduciary duties.  Per the rules of the Audit Committee Charter, the Audit Committee Directors were required to meet at least quarterly, which meant that they did meet or should have met several times during the AKF Fraud.  Thus, the Audit Committee Directors face a substantial likelihood of liability, and any demand on them would be futile.

202.    Demand is also excused as to Defendants Berg, Desoer, Diaz, and Roper (the "Compensation Committee Directors") due to their failure to uphold the Compensation Committee Charter as members of the Compensation Committee.  The Compensation Committee Directors, pursuant to DaVita's Compensation Committee Charter, were responsible for reviewing significant healthcare regulatory compliance risk areas and monitoring and overseeing the effectiveness of DaVita's healthcare regulatory compliance program.  Additionally, with the Audit Committee, the Compensation Committee Directors were also responsible for reviewing the steps management was taking to monitor, control, and report risk exposures, and assisting the Board with overseeing compliance with healthcare regulatory requirements.  The Compensation Committee Directors had primary responsibility for overseeing healthcare regulatory requirements and for directing the Company's responses to pending governmental investigations. By allowing the Company to engage in the Fraudulent Insurance Misconduct, the Compensation Committee Directors breached their fiduciary duties.     Per the rules of the Compensation Committee Charter, the Audit Committee Directors were required to meet at least quarterly, which meant that they did meet or should have met several times during the AKF Fraud.  Thus, the Compensation Committee Directors face a substantial likelihood of liability, and any demand on them would be futile.

203.    Moreover, the Audit Committee Directors and the Compensation Committee Directors were specifically responsible for working together with regard to issues concerning oversight of healthcare legal and regulatory compliance and oversight of enterprise risk management.  By allowing DaVita to engage in the Fraudulent Misconduct, the members of the two committees further breached their fiduciary duties, face a substantial likelihood of liability, and thus any demand on them would be futile.

204.    Demand is also excused as to Defendants Arway, Diaz, and Nehra (the "Public Policy Committee Directors") due to their failure to uphold the Public Policy Committee Charter as members of the Compensation Committee.  The Public Policy Committee Directors, pursuant to DaVita's Public Policy Committee Charter, were responsible for advising the Board on government relations and public policy matters and for recommending related policies and procedures to the Board.  They were also responsible for overseeing the Company's government affairs activity.  By allowing the Company to engage in the Fraudulent Misconduct, the Public Policy Committee Directors breached their fiduciary duties.  Thus, the Public Policy Committee Directors face a substantial likelihood of liability, and any demand on them would be futile.

205.    Additionally, each one of the Directors, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by more than $165.4 million for its own common stock during the period in which the false and misleading statements were made.  The Directors, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases.  Thus, the directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

206.    DaVita has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for DaVita any part of the damages DaVita suffered and will continue to suffer thereby.  Thus, any demand on the Directors would be futile.

207.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

208.    The acts complained of herein constitute violations of fiduciary duties owed by DaVita's officers and directors, and these acts are incapable of ratification.

209.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of DaVita.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of DaVita, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

210.     If there is no directors' and officers' liability insurance, then the Directors will not cause DaVita to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

211.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least six of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(A) of the Securities Exchange Act of 1934

212.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

213.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

214.     Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

215.    Under the direction and watch of the Directors, the 2016 Proxy Statement failed to disclose the Company's: (1) engagement in a fraudulent scheme to steer patients into unnecessary private insurance plans in order to maximize profits, which was accomplished through the use of the AKF; (2) concealment of the true nature of its relationship with the AKF; (3) fraudulently gained revenues and profits through the fraudulent scheme; (4) inclusion of such fraudulently derived revenue in its financial reports; (5) failure to maintain effective internal controls; and (6) making false and/or misleading statements and/or omissions of material fact regarding the fraudulent scheme.

216.    The Individual Defendants also caused the 2016 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's revenues and profits, and therefore its financial performance, were based on unlawful activity and therefore any compensation based on the Company's financial performance was also based on the unlawful activity.  Moreover, in support of their compensation plan, the 2016 Proxy Statement stated that "the Company believes that its executive compensation program is reasonable, competitive and strongly focused on pay-for-performance principles."  It even cited consolidated net revenue and net revenue growth as factors indicating strong performance.  As set forth herein, the Company's stated consolidated net revenue was based on unlawful activity, and thus presented a misleading portrayal of the Company's performance.

217.    The 2016 Proxy Statement also made reference to the Company's Code of Ethics and its Code of Conduct.  The Code of Conduct required the Company and Individual Defendants to abide by relevant laws and statutes.  By engaging in the Fraudulent Insurance Misconduct, including the AKF Fraud, the Individual Defendants violated the Code of Conduct.

The 2016 Proxy Statement failed to disclose these violations and also failed to disclose that the terms of the Code of Ethics and the Code of Conduct were being violated.

218.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2016 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2016 Proxy Statement, including but not limited to, election of directors and the approval of officer compensation.

219.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2016 Proxy Statement.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

220.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

221.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of DaVita's business and affairs.

222.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

223.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of DaVita.

224.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

225.    In further breach of their fiduciary duties owed to DaVita, the Individual Defendants willfully or recklessly caused the Company to engage in the Fraudulent Insurance Misconduct, including the AKF Fraud, and make false and misleading statements and omissions of material fact.  The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

226.    In further breach of their fiduciary duties owed to DaVita, the Individual Defendants willfully or recklessly caused the Company to repurchase $165.4 million worth of Company stock at artificially inflated prices while a majority of them made lucrative insider sales.

227.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of DaVita's securities and disguising insider transactions.

228.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the

Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of DaVita's securities and engaging in insider transactions. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

229.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

230.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, DaVita has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

231.    Plaintiff on behalf of DaVita has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

232.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

233.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, DaVita.

234.    The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or

similar compensation from DaVita that was tied to the performance or artificially inflated valuation of DaVita, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

235.    Plaintiff, as a shareholder and a representative of DaVita, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits–including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

236.    Plaintiff on behalf of DaVita has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

237.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

238.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence DaVita, for which they are legally responsible.

239.    As a direct and proximate result of the Individual Defendants' abuse of control, DaVita has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, DaVita has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

240.    Plaintiff on behalf of DaVita has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

241.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

242.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of DaVita in a manner consistent with the operations of a publicly-held corporation.

243.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, DaVita has sustained and will continue to sustain significant damages.

244.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

245.    Plaintiff, on behalf of DaVita, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

246.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

247.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

248.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

249.    Plaintiff on behalf of DaVita has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of DaVita, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to DaVita;

(c)    Determining and awarding to DaVita the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing DaVita and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect DaVita and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of DaVita to nominate at least six candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding DaVita restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

Dated: May 30, 2017                          Respectfully submitted,

Of Counsel:                                  **FARNAN LLP**

Phillip Kim                                  /s/ Brian E. Farnan
**THE ROSEN LAW FIRM, P.A.**                 Brian E. Farnan (Bar No. 4089)
275 Madison Avenue                           Michael J. Farnan (Bar No. 5165)
New York, NY 10016                           919 N. Market St., 12th Floor
Telephone: (212) 686-1060                    Wilmington, DE 19801
Facsimile: (212) 202-3827                    Telephone: (302) 777-0300
Email: pkim@rosenlegal.com                   Facsimile: (302) 777-0301
                                             bfarnan@farnanlaw.com
Timothy W. Brown                             mfarnan@farnanlaw.com
**THE BROWN LAW FIRM, P.C.**
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

                                             *Attorneys for Plaintiff*